Natasha ANGOUCHEVA, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 95–2370.

United States Court of Appeals, Seventh Circuit.

Argued May 13, 1996.

Decided Feb. 11, 1997.

Mary E. Welsh (argued), for Natasha Angoucheva.

Janet Reno, U.S. Attorney General, Washington, DC, Samuel Der–Yeghiayan, I.N.S., Chicago, IL, James B. Burns, Office of the U.S. Attorney, Chicago, IL, Richard M. Evans, William J. Howard, Donald A. Couvillon, Francesco Isgro, David M. McConnell, Stephen W. Funk, Terri J. Lavi (argued), Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for I.N.S.

Nancy Kelly, Women Refugees Program, Cambridge & Somerville Legal Services, Cambridge, MA, for amicus curiae, Women Refugees Project of Harvard Law School.

Before COFFEY, MANION, and ROVNER, Circuit Judges.

PER CURIAM.

Natasha Angoucheva, a Bulgarian woman of Macedonian descent, petitions for review of a final order of deportation that denied her applications for asylum and withholding of deportation. Adopting the findings and conclusions of the Immigration Judge ("IJ"), the Board of Immigration Appeals (the "BIA" or "Board") determined that Angoucheva was ineligible for asylum because she had not established that she had been persecuted prior to leaving Bulgaria or that she had a well-founded fear of future persecution if returned there. In petitioning for review of that decision, Angoucheva argues that the Board did not fully consider her claim, and also that the evidence before the Board was sufficient to establish past persecution and a well-founded fear of future persecution. Because we are not confident that the Board fully considered vital aspects of Angoucheva's claim, we grant the petition for review, vacate the Board's order, and remand for further proceedings.

I.

A.

Angoucheva decided to leave Bulgaria in May 1990 after a State Security officer sexually assaulted her in the course of an interrogation at a State Security office. The interrogation involved Angoucheva's political activities on behalf of the United Macedonia Organization ("UMO–Ilinden"), which was formed in 1990 to promote the rights of Macedonians living in Bulgaria. A month or two after the assault, Angoucheva booked herself on a private tour to the United States. She arrived in this country on July 12, 1990, and applied for asylum shortly thereafter. Angoucheva's original asylum application did not detail the alleged persecution that is the subject of her current claim, yet at the hearing on her second application, Angoucheva offered the following explanation for the discrepancy. She explained that she could not speak English when she arrived in this country, and that she had sought the assistance of a Bulgarian woman she had met at the Immigration Office in completing her application. The woman had agreed to complete the application, but she had been in a hurry and never translated to Angoucheva what she had written. (Apparently, the woman had taken the necessary information from Angoucheva's passport.) Although Angoucheva was later interviewed by an asylum officer, the woman from her church who acted as a translator during that interview did not speak the same dialect as Angoucheva and thus did not provide complete and accurate translations. The INS ultimately denied Angoucheva's asylum application and initiated deportation proceedings.

Angoucheva then secured legal counsel, conceded deportability, and submitted a revised application for asylum, detailing for the first time the alleged persecution to which she had been subjected in Bulgaria. At the hearing on her revised application, the INS offered the earlier application into evidence and suggested that her present assertions were fabricated. Yet the IJ credited Angou-

cheva's explanation for the discrepancies and found that her current claim was not "completely fabricated." (Administrative Record ("AR") at 57.) The IJ noted that this finding was "not tantamount . . . to concluding that her claim is so inherently persuasive that it is entitled to full evidentiary weight" (*id.*), but he did not specifically reject any portion of Angoucheva's claim as not credible. Indeed, in discussing Angoucheva's claim of past persecution, the IJ seemed to credit all of her factual assertions. Despite the ambiguity in the IJ's findings, the INS concedes here that the events underlying Angoucheva's claim in fact occurred. (INS Br. at 18 ("No one disputes that [Angoucheva] was sexually assaulted and that as a result she suffers from post-traumatic stress disorder.").) We accept that concession in describing the relevant events.

## B.

Angoucheva grew up in Petrich, a town in the southwestern or "Pirin" region of Bulgaria that is home to many Macedonians.[1] Angoucheva's family was quite vocal in asserting its Macedonian ethnicity, and as a result, various family members encountered difficulties with Bulgaria's Communist regime, which generally attempted to suppress all assertions of a separate Macedonian identity. The first such·incident occurred in May 1970, when State Security officers forcibly seized Angoucheva's father from the family home. It seems that her father, a grade school teacher in Petrich, had frequently lectured his students on Macedonian history using the Macedonian language. He also apparently had aided a Macedonian organization to which his brother belonged by typing a leaflet urging Macedonians to fight for their civil rights. When he was returned home approximately six hours later, Angoucheva's father had been severely beaten. State Security

officers also had forced him to sign a document promising to cease his pro-Macedonian activities. Angoucheva was subsequently taunted in school by students and teachers alike about her father's political difficulties.

Angoucheva related various other occasions during the 1970s and 1980s when she or members of her family either were arrested, interrogated, or beaten for asserting their Macedonian ancestry. Angoucheva was herself interrogated at the State Security office in Sofia in December 1973 when the authorities suspected (correctly, it turned out) that she and her aunt had hidden Angoucheva's uncle from police pursuing him on account of his pro-Macedonian activities.[2] The interrogating officer accused Angoucheva's entire family of regularly engaging in illegal political activities. When Angoucheva told the officer that she was proud to be a Macedonian, he threatened to have her arrested, yelling "There are no Macedonians in Bulgaria!" The officer eventually forced Angoucheva and her aunt to sign a document promising that they would stop calling themselves Macedonians.

Approximately five months later, Angoucheva encountered on a Sofia street two State Security officers who had observed the December 1973 interrogation. When Angoucheva was forced to tell the officers where she lived, one of them remembered her from the interrogation and promptly struck her on the side of the head, blackening her eye. The other officer then struck her hips and kicked her legs. The officers indicated that she would get more of the same if she continued to call herself Macedonian. Angoucheva was understandably reluctant after this incident to identify herself as Macedonian.

Although Angoucheva relies on these earlier incidents to point up the Bulgarian government's general hostility toward citizens of

1. In *Urukov v. INS*, 55 F.3d 222, 224 n. 2 (7th Cir.1995), we provided the following history of Bulgaria's Pirin region:

In the late nineteenth century, when the Ottoman Turks began relinquishing control over Macedonia, the territory was divided into four parts and incorporated into Bulgaria, Albania, Greece and Serbia. In Bulgaria, it is estimated that there are over one million people whose ancestors lived in Macedonia. A

large majority of these people live in the Pirin region.

2. Angoucheva had moved to Sofia from Petrich in 1971 in order to attend medical school. She completed her studies in 1974 and then worked for three years in a Sofia hospital as a midwife. Angoucheva then secured employment as a school nurse.

Macedonian descent, her claims for asylum and withholding of deportation focus more specifically on events occurring shortly before her departure from Bulgaria. In November 1989, Communist dictator Todor Zhivkov fell from power, and the new Bulgarian government espoused its interest in ensuring human rights for all Bulgarians. It was in this environment that the UMO–Ilinden was founded in Petrich, and Angoucheva quickly joined the organization in the hope that the new government could be persuaded to recognize Macedonians as a distinct ethnic group whose culture should not be suppressed. Angoucheva soon learned, however, that the general anti-Macedonian sentiment in Bulgaria had not disappeared with the change in government.

On March 11, 1990, Angoucheva participated in a pro-Macedonian rally at a public park in Sofia. The rally's purpose was to protest the government's refusal to recognize the separate ethnic identity and rights of Macedonians. Angoucheva and her fellow protesters were jeered by the gathering crowd and eventually were surrounded by State Security officers. Afterward, Angoucheva hosted a gathering at her Sofia apartment for at least ten others who had come from Petrich to participate in the rally. The group sang Macedonian songs and listened to Macedonian music.

The following month, UMO–Ilinden sponsored a rally at Rozen Monastery in Sandanski to commemorate the anniversary of the death of Yane Sandanski, a Macedonian hero who had led an unsuccessful uprising against the Turks in the early 1900s. When it got wind of the rally, the Bulgarian government suspended public transportation into Sandanski and sent State Security officers to prevent those already there from assembling. Although the UMO–Ilinden's chairman was warned that the rally was illegal, it proceeded as planned. The following day, Sofia's state-owned newspaper denounced the rally as anti-Bulgarian and reiterated that such gatherings were illegal.

In the meantime, a neighbor had reported Angoucheva to State Security for the "questionable" gathering at her home after the March 11 rally. She was ordered to appear at Sofia's State Security office at 5:00 p.m. on April 27.

Angoucheva went to the State Security office on April 27 as instructed and encountered Major Michael Beltchev, a uniformed officer who first examined her passport. Beltchev then left Angoucheva alone in his office for approximately twenty minutes before returning with two officers who merely looked at Angoucheva for a moment before leaving. Beltchev began to question Angoucheva about the March 11 gathering, and he indicated that gatherings with a political orientation were not permitted in private homes. He explained that Macedonians do not exist in Bulgaria, that organizations like the UMO–Ilinden are illegal, and that they threaten the unity and stability of the country. Beltchev accused UMO–Ilinden members of being "separatists" and "traitors."

Beltchev also was aware that Angoucheva had participated in the April Sandanski rally, and he questioned her about that rally as well, warning her that the government would act to squelch such anti-Bulgarian activities in the future. After leaving the room to take a telephone call, Beltchev explained that before he could release her, Angoucheva would be required to sign a notice promising that she would cease her pro-Macedonian activities and that she no longer would communicate with Macedonian activists, call herself Macedonian, or criticize the Bulgarian government. Angoucheva signed the notice, and Beltchev put it in her folder.

Beltchev then began to stare at Angoucheva without speaking, making her quite nervous. He eventually lit and smoked a cigarette, watching Angoucheva all the while. Beltchev then asked Angoucheva personal questions about her family situation, and she told him of her 1989 divorce and of her son, who lived with her parents in Petrich. It was by this point approximately 7:00 p.m., and Beltchev walked into the deserted corridor, locked the front door, and turned off the lights. He returned to the office, turned off the lights there too, and closed the door behind him, smiling. Beltchev then touched Angoucheva's hair, and she began to shake. Taking off his coat, Beltchev told Angoucheva that she was beautiful. He grabbed her

shoulders and kissed her. Angoucheva began to cry and begged Beltchev not to do anything to her. The officer told Angoucheva that if she was good to him, he would not report her folder to Internal Affairs, the regional State Security office. As Angoucheva continued to shake and sob, Beltchev unbuttoned her blouse and placed his hand on her breast, breathing heavily on her cheek all the while. He tugged at her skirt, attempting to pull down her underwear and pantyhose. Beltchev was at this point interrupted by the ringing of his telephone. After hushing Angoucheva's sobs, Beltchev answered the call. His voice quickly took on a serious tone, and he indicated to the caller that he would be ready right away. Hanging up, Beltchev told Angoucheva that she was free to go, but he warned her to keep silent about what he had done. Angoucheva believed that Beltchev would harm her if she did not.

By the time Angoucheva left the State Security office, it was dark, and she wandered Sofia's streets before finally returning home. She could not sleep that night, and the following morning, she traveled to Petrich to visit her parents and son. Although she stayed in Petrich a few days, Angoucheva did not tell anyone of the attempted rape. Upon returning to Sofia, Angoucheva feared for her physical safety; she was afraid to respond to knocking at her door, and she believed that she was being followed. She also experienced physical problems such as numbness in her hands and feet, and high blood pressure. At one point, Angoucheva's neighbors summoned a doctor, who found no physical problem and attributed her symptoms to emotional stress. Angoucheva ultimately decided that she had to leave Bulgaria, and she made arrangements for a private ten-day tour to the United States. After arriving in this country and applying for asylum, Angoucheva told only her attorneys and a clinical social worker of the sexual assault.

That social worker, Heidi Kon, testified at the hearing below. She told of three two-hour counseling sessions she had conducted with Angoucheva, and of the conclusions that grew out of those sessions—that Angoucheva was suffering from post-traumatic stress dis-order and that she was moving from the denial to the reorganization stage of rape trauma syndrome. Kon also related what Angoucheva had told her of the assault and described the recurrent recollections and flashbacks, as well as nightmares, that Angoucheva still experiences. Kon indicated that the smell of cigarette smoke, which reminds Angoucheva of Major Beltchev, can cause a flashback, and that Angoucheva will then experience the same numbness in her hands and feet that she experienced in the days following the assault. Angoucheva had related to Kon a particular incident that occurred at a shopping mall in this country— Angoucheva saw a man in the mall who resembled Major Beltchev, and she fled from the mall, became nauseous and disoriented, and was unable to find her car in the parking lot. Kon testified that "it would be nearly impossible [for someone] to fake the symptoms which [Angoucheva] has described, in the manner in which she seems to describe them, with emotion and detail." (AR 112.) Given the severity of the trauma from which Angoucheva still suffers, Kon opined that it would be "extraordinarily detrimental" to force her to return to Bulgaria—the place where the assault occurred. Kon also observed that Angoucheva's fear of returning to Bulgaria is genuine, and she emphasized that Angoucheva had felt compelled to flee Bulgaria after the assault and to come to a place where she had no family or friends, leaving her parents and adolescent son behind.

Angoucheva also offered evidence addressed to conditions in Bulgaria since her departure. As to her own family, Angoucheva testified that State Security officers inquired of her aunt in Sofia about her whereabouts and directed the aunt to retain any letters she might receive from Angoucheva. She also indicated that her telephone calls to family members are monitored and sometimes even interrupted by the authorities.

As for conditions in Bulgaria generally, Angoucheva asserted that they have not improved, at least not for members of the UMO–Ilinden. That organization has never been recognized by the Bulgarian government and in fact has been declared illegal, a decision upheld by Bulgaria's courts. An-

goucheva submitted newspaper articles revealing that the organization's leaders are being investigated on criminal charges that could result in imprisonment terms of three to five years. She also presented affidavits from residents of and visitors to Bulgaria which indicate that conditions for Macedonians and Ilinden members have not improved. The 1993 annual report of Human Rights Watch, the parent group of Helsinki Watch, observed that Ilinden members who gathered to commemorate the death of Sandanski in April 1993 were beaten by state police. (AR 377.) Angoucheva presented evidence of eyewitness accounts to that event. Helsinki Watch's 1991 report observed, moreover, that members of the UMO–Ilinden and of other Ilinden organizations "have experienced numerous human rights violations, including restrictions on petition gathering, inability to hold a congress, confiscation of their passports, and intimidation by State Security (the secret police)." (AR 328.)

### C.

After considering the above evidence, the IJ found Angoucheva ineligible for asylum because she had not established either past persecution or a well-founded fear of future persecution. Although the IJ found Angoucheva's account of her experiences in Bulgaria to be consistent with the government's policy of forced assimilation of the Macedonian minority, he did not find her evidence sufficient to establish past persecution. The IJ offered five "observations" in support of that conclusion: (1) Angoucheva had been able to obtain a graduate level education and to secure full-time employment as a midwife; (2) on the two occasions when Angoucheva had been interrogated by State Security officers (in December 1973 and April 1990), she had been released without formal charge; (3) although Angoucheva had been "threatened with violent aggression during her April, 1990 interrogation, the unwarranted actions of her interrogator [did] not establish a pattern or practice of government inspired or condoned persecution;" (4) Angoucheva had been able to obtain a passport and to leave Bulgaria in July 1990, as well as to travel outside the country with her husband in 1982, 1983, and 1987; and (5) Angoucheva had not shown that members of her family who remained in Bulgaria had encountered significant problems since her departure. (AR 58–59.)

The IJ found, moreover, that Angoucheva had not established a well-founded fear of persecution if she were returned to Bulgaria. He offered only the following explanation for that finding:

Although it is true that an applicant for asylum who asserts a well-founded fear of future persecution is not required to demonstrate that she would be singled out for mistreatment where she establishes her inclusion in, and identification with, a similarly situated group upon which there has been a pattern or practice of persecution, the evidence here does not support the proposition that all Macedonians have a well-founded fear of future persecution, rather, more likely those whose political activities were more visible or active than the Respondent.

(AR 60.) Because the IJ found Angoucheva ineligible for asylum, he necessarily denied her application for withholding of deportation. The IJ did, however, grant Angoucheva's request for voluntary departure. Angoucheva appealed to the BIA, which affirmed the IJ's "comprehensive and well-reasoned decision" for the reasons set forth therein. (AR 2.)

### II.

### A.

This case concerns the now-familiar procedures by which a deportable alien currently in the United States may attempt to remain here by pointing to the persecution she already experienced in her homeland or which she fears if returned there. *See, e.g., Sanon v. INS,* 52 F.3d 648, 650 (7th Cir. 1995); *Carvajal–Munoz v. INS,* 743 F.2d 562, 564 (7th Cir.1984). The first route, and the one followed by Angoucheva here, is to apply for asylum pursuant to 8 U.S.C. § 1158(a). That relief is available at the Attorney General's discretion if she or her designee concludes that the alien qualifies as a "refugee" within the meaning of 8 U.S.C.

§ 1101(a)(42)(A). An individual qualifies if she "is unable or unwilling to return" to her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* An alien will therefore be considered a refugee if she has suffered persecution in the past on account of one of the statutory grounds or if she can show an objectively reasonable fear of such persecution in the future. *See generally INS v. Cardoza–Fonseca,* 480 U.S. 421, 427–28, 107 S.Ct. 1207, 1211, 94 L.Ed.2d 434 (1987); *see also Sanon,* 52 F.3d at 651. If the alien establishes past persecution, moreover, a rebuttable presumption arises in favor of granting asylum. *Draganova v. INS,* 82 F.3d 716, 722 (7th Cir.1996); *Skalak v. INS,* 944 F.2d 364, 365 (7th Cir.1991); *Osaghae v. INS,* 942 F.2d 1160, 1163 (7th Cir.1991). Yet that presumption may be overcome by evidence suggesting that conditions in the alien's home country have changed to such an extent that she no longer is in danger of persecution there. *Draganova,* 82 F.3d at 722; *Skalak,* 944 F.2d at 365; *see also* 8 C.F.R. § 208.16(b)(2).

■ We review the Board's determination on refugee status under the substantial evidence test, which requires us to uphold the Board's conclusion if it is "supported by reasonable, substantial, and probative evidence on the record as a whole." 8 U.S.C. § 1105a(a)(4); *see also INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992). Although the Supreme Court has held that an applicant for asylum need not show "that it is more likely than not that he or she will be persecuted in his or her home country" (*Cardoza–Fonseca,* 480 U.S. at 449, 107 S.Ct. at 1222), our cases require the applicant to present "specific facts establishing that he or she has actually been the victim of persecution or has some other good reason to fear that he or she will be singled out for persecution. . . ." *Carvajal–Munoz,* 743 F.2d at 574 (emphasis in original); *see also Draganova,* 82 F.3d at 720–21. If the Board determines that the applicant failed to

make that showing, we will not reverse its decision unless the applicant's evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias–Zacarias,* 502 U.S. at 483–84, 112 S.Ct. at 817.

■ The second procedural route, withholding of deportation, is more difficult to establish than the first. Whereas a grant of asylum is discretionary even if the applicant qualifies as a "refugee," withholding of deportation is mandatory once "the Attorney General determines that [the] alien's life or freedom would be threatened in [her native] country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1); *see also Cardoza–Fonseca,* 480 U.S. at 443–44, 107 S.Ct. at 1219–20. Because of the mandatory nature of this relief, the applicant bears a heavier burden than in establishing eligibility for asylum—she must show a "clear probability" of persecution, which means that "it is more likely than not that [she] would be subject to persecution on one of the specified grounds." *INS v. Stevic,* 467 U.S. 407, 429–30, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984); *see also Sanon,* 52 F.3d at 650. An alien who fails to satisfy the requirements for asylum, then, necessarily fails to meet the more stringent "clear probability" standard required for withholding of deportation. *E.g., Man v. INS,* 69 F.3d 835, 837 (7th Cir.1995); *Milosevic v. INS,* 18 F.3d 366, 372 (7th Cir.1994).[3]

### B.

■ Angoucheva initially argues that the Board violated her right to due process by ignoring half of her claim—that prior to fleeing Bulgaria, she was singled out for persecution on account of her political opinion. Her argument stems from the imprecise language the Board used in dismissing her appeal. Although it affirmed for the reasons set forth in the IJ's decision, the Board specifically noted that the IJ had "adequately

---

**3.** Angoucheva submitted her revised application for asylum after the INS had instituted deportation proceedings against her. In that circumstance, the INS considers her asylum application also as a request for withholding of deportation under 8 U.S.C. § 1253(h). *See* 8 C.F.R. § 208.3(b); *see also Stevic,* 467 U.S. at 423 n. 18, 104 S.Ct. at 2497 n. 18.

and correctly determined that [Angoucheva] had not met her burden of proof in establishing a well-founded fear of persecution on account of a statutorily protected reason." (AR 2.) Angoucheva takes this to mean that the Board failed even to consider her distinct claim of past persecution, which is not mentioned in its order. As we said, however, the Board actually adopted the IJ's "comprehensive and well-reasoned decision" (*id.*), and in that circumstance, it is the IJ's reasoning that becomes the focus of our review. *See Guentchev v. INS*, 77 F.3d 1036, 1038 (7th Cir.1996); *Cuevas v. INS*, 43 F.3d 1167, 1170 (7th Cir.1995); *see also Urukov*, 55 F.3d at 228. The IJ plainly considered and rejected the argument that Angoucheva is eligible for asylum due to the persecution she already endured in Bulgaria. We can only interpret the Board's order as also adopting the portion of the IJ's decision addressing that claim. *See Guentchev*, 77 F.3d at 1038.

■ Although that conclusion excuses the Board's sloppiness, it is something of a double-edged sword, for in this case as in others where the Board adopts the IJ's reasoning, the Board must be charged with whatever flaws or inadequacies we discern in the IJ's reasoning. *See, e.g., Draganova*, 82 F.3d at 720 (remanding due to error in legal standard employed by the IJ that was not corrected by the Board); *Hengan v. INS*, 79 F.3d 60 (7th Cir.1996); *Borca v. INS*, 77 F.3d 210, 216 (7th Cir.1996). When the Board adopts a flawed decision, in other words, we cannot uphold it only because the Board might have been able to eliminate the flaws and come to the same conclusion. *See Cuevas*, 43 F.3d at 1170 ("if the IJ's reasoning is inadequate, we will not independently review the record in order to uphold the decision"). As in any other case, we will remand to enable the Board to properly consider the applicant's claim. *See, e.g., Draganova*, 82 F.3d at 721–22; *Hengan*, 79 F.3d at 63–64; *Borca*, 77 F.3d at 217.

### C.

■ The IJ found that Angoucheva had not presented evidence sufficient to establish that she was a victim of past persecution or that she had a well-founded fear of future persecution. Angoucheva argues that the IJ came to these conclusions, however, only after mischaracterizing the nature of her claim. The IJ focused throughout his opinion on Angoucheva's Macedonian ethnicity, and particularly on whether that heritage had or would subject her to government-sponsored persecution. (*See* AR 52, 58–60.) Indeed, in rejecting Angoucheva's assertion of a well-founded fear of future persecution, the IJ concluded that the evidence did not support the proposition that all 1.5 million Macedonians in Bulgaria had such a well-founded fear. (AR 60.) Although Angoucheva testified generally about the harassment that her family members have regularly endured as outspoken Macedonians, her claim to asylum does not rest on her Macedonian heritage alone, but on her membership in the UMO–Ilinden, an organization that has been declared illegal as a result of its "separatist" views. After joining the UMO–Ilinden in the spring of 1990, Angoucheva claims that she in fact was singled out for persecution by the Bulgarian government, as she was summoned to the State Security office to be interrogated about a gathering in her home and was then sexually assaulted by the interrogating officer. Angoucheva readily concedes, in fact, that she had no grounds for asylum prior to these events, all of which were in response to her membership in and activities on behalf of the UMO–Ilinden. The IJ only briefly mentioned Angoucheva's Ilinden activities in his opinion, and then only in providing a brief background on the nature of her claims. In ultimately concluding that Angoucheva was ineligible for asylum, moreover, the IJ made but the slightest mention of the interrogation and sexual assault that followed Angoucheva's activities on behalf of the UMO–Ilinden in the spring of 1990. His opinion focused more broadly on the treatment she had or would receive as a Macedonian. Yet we have made clear in previous cases that we expect the Board to consider the individualized circumstances on which an alien's claim for asylum is based, and in this case, the IJ's opinion gives no indication that he considered Angoucheva's claim based on her membership in the UMO–Ilinden. *See, e.g., Hengan*, 79 F.3d at 64 (remanding where IJ's opinion did not re-

spond to the applicant's contentions, observing that "[a]gencies must respond to the arguments made to them and avoid decisions based on irrelevancies."); *Salameda v. INS*, 70 F.3d 447, 451 (7th Cir.1995) (finding that Board's order cannot stand where it did not address in a rational manner the issues that the aliens had tendered for consideration); *Sanon*, 52 F.3d at 652–53 (remanding where Board failed to adequately address issues tendered by the applicant in support of his asylum claim); *Shahandeh–Pey v. INS*, 831 F.2d 1384, 1389 (7th Cir.1987) ("A decision that does not reflect, even at some minimal level, consideration of important aspects of an individual's claim is one made, for all a reviewing court can know, 'without rational explanation.' ").

On remand, the Board must make thorough findings on at least two issues. First, was Angoucheva singled out and targeted for harassment and possible persecution not simply because she was Macedonian, but because she was a member of the UMO–Ilinden? More discussion and examination of this particular group and the experience of persecution of other members would be helpful in determining whether her active membership would cause a legitimate fear of persecution.

Second, the Board should clarify its examination of the sexual assault by Major Beltchev that could have led to a forcible rape had he not been interrupted by a telephone call. The Board's order did not mention that incident, and the IJ dismissed it in a single sentence, concluding that Beltchev's conduct did not "establish a pattern or practice of government inspired or condoned persecution." (AR. 59.) In defending that decision here, the INS suggests that the assault may not have been politically motivated, but may have resulted simply from the fact that Beltchev found Angoucheva sexually attractive. That suggestion, however, seems to us insensitive to the more violent motivations that could be considered. The Service may have meant to suggest that the Major was abusing his power for personal edification, rather than carrying out an officially condoned act of the Bulgarian government. That interpretation of Beltchev's conduct could be derived

from his apparent desire to hide the assault from other government officials. Or it could be that the assault was inextricably linked to the Bulgarian government's disapproval of Angoucheva's activities on behalf of the UMO–Ilinden.

These are issues the Board, with its special expertise in the complex nature of political and governmental activity in foreign countries, must decide. The decision should be fully explained so that this court is not left to speculate about issues raised by Angoucheva that the Board should have considered.

## III.

For the foregoing reasons, we GRANT the petition for review, VACATE the Board's order, and REMAND for further proceedings at which the Board should fully consider Angoucheva's arguments for asylum based on her Ilinden activities.

ILANA DIAMOND ROVNER, Circuit Judge, concurring.

I join the court in vacating the Board's deportation order and remanding for further consideration of Angoucheva's asylum application. I too am not convinced that the particular facts and circumstances relied on by Angoucheva to support her asylum application were adequately considered by the IJ or the Board. In addressing her persecution claims, the IJ effectively drained any force from Angoucheva's arguments by focusing only on her Macedonian ethnicity while all but ignoring her activities on behalf of the UMO–Ilinden and the chilling response those activities prompted. That is evidenced in particular by the IJ's observation that Angoucheva failed to establish that all 1.5 million Macedonians in Bulgaria have a well-founded fear of future persecution. (AR 60.) The IJ's conclusion is not particularly startling, but as I said, it dilutes unfairly the particular claim of persecution that Angoucheva advances here. As the court points out, Angoucheva's claim rests primarily on her membership in and activities on behalf of the UMO–Ilinden, and not on her Macedonian heritage alone. Yet the IJ's discussion of those activities, and of the sexual assault that grew out of them, is so cryptic that I cannot

be confident that the heart of Angoucheva's claim was ever seriously considered. And as we reaffirm today, the Board has an obligation to consider the individualized circumstances offered by an applicant to support her claim for asylum. (*See ante* at 789–90.)

My concerns about the IJ's lack of attention to the truly troubling aspects of Angoucheva's application are not mollified by the fact that at least three of the five "observations" he made in rejecting her past persecution claim are largely irrelevant. (*See ante* at 787.) The IJ first noted that despite harassment from her teachers and other students, Angoucheva had been able to obtain a graduate level education and to secure full-time employment as a midwife. (AR 58.) As we remarked about a similar "observation" in *Hengan v. INS,* 79 F.3d 60, 63 (7th Cir.1996), however, "true enough, but irrelevant to [the applicant's] contention." The IJ's finding here, like the similar finding in Hengan, does not address the particular circumstances of Angoucheva's persecution claim, as it addresses only generally the plight of Bulgaria's Macedonian population under the Communist regime of Todor Zhivkov. Angoucheva's education and employment history seem to me largely irrelevant to the specific claim that she was persecuted in 1990 after becoming a politically-active member of the UMO–Ilinden.

The IJ's second observation—that Angoucheva was interrogated both in December 1973 and April 1990 but was not formally charged on either occasion—also does not seem particularly probative. Although Angoucheva was not formally charged with any offense after the pertinent interrogation in 1990, she *was* sexually assaulted by the interrogating officer, who indicated that he would not report her to Internal Affairs if "she was good to him." The IJ essentially found, then, that Angoucheva was not persecuted because the State Security officer did not arrest her, he merely tried to rape her! *See id.* (criticizing similar finding as irrelevant—"the Ceausescu regime did not arrest Hengan, but in 1991 the police harassed her weekly").

Finally, the IJ noted that Angoucheva was able to travel outside Bulgaria in 1982, 1983, and 1987, and that she had no difficulty obtaining a passport and leaving the country in 1990. Angoucheva's earlier travels strike me as similarly irrelevant to her current claim—she merely accompanied her husband when he traveled outside the country as a professional musician, and in any event, those trips pre-date her activities on behalf of the UMO–Ilinden in 1990. Moreover, the fact that Angoucheva was able to leave Bulgaria in 1990 not only fails to refute her claim, it actually supports it. I would not expect that a government intent on squelching a growing movement for Macedonian rights would object when one of the activists decided to pack up and leave. *See id.*

The fifth of the IJ's observations could be relevant to Angoucheva's claim of past and future persecution, but it too reflects a refusal to grapple with Angoucheva's particularized circumstances. The IJ indicated that the members of Angoucheva's family who remain in Bulgaria have not encountered significant problems since her departure in 1990. If Angoucheva's claim were based only on her Macedonian ethnicity, that would be a highly relevant fact, for the family members left behind would be similarly situated to the applicant. Yet there is no evidence in this record to suggest that the family members who remained are members of the UMO–Ilinden who, like Angoucheva, have already been singled out by government authorities. Moreover, the IJ makes no mention of the fact that after Angoucheva's departure, State Security officers questioned her aunt about her whereabouts, directed the aunt to retain any letters she might receive, and may even be monitoring the family's telephone calls. Those facts would seem to support Angoucheva's claim that she is not similarly situated to the family members who remain, but that she is of greater interest to the Bulgarian government because of her UMO–Ilinden activities. I believe that the IJ and the Board should have addressed this evidence and its effect on Angoucheva's claim. *See Sanon v. INS,* 52 F.3d 648, 652 (7th Cir.1995) (criticizing Board's finding that nothing has happened to the alien's family in his native country when the evidence showed that the alien has been

unable to speak with family members because they feared retribution if they spoke to him).

Only in the third of his five "observations" did the IJ come close to addressing the actual substance of Angoucheva's claim:

> Although it appears that [Angoucheva] was the victim of intimidation, and threatened with violent aggression during her April, 1990 interrogation, the unwarranted actions of her interrogator do not establish a pattern or practice of government inspired or condoned persecution.

(AR 59.) Although it is possible to interpret this finding in one of two ways, the IJ appears to have adopted the INS' view that the attempted rape was nothing but a personal act of Major Beltchev, and not an official government response to Angoucheva's political opinions.[1] The INS presses that interpretation here, arguing that the record does not compel the finding that Angoucheva was sexually assaulted by a State Security officer because of her ethnicity and political opinions, as opposed to the fact that the officer may personally have found her sexually attractive. (*See* INS Br. at 13, 18 & 20 (citing *INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 816–17, 117 L.Ed.2d 38 (1992)).)[2] If that is what the IJ had in mind, then I certainly agree with my colleagues that a more detailed explanation is required in light of the evidence Angoucheva offered here. I would expect the Board to address, for example, how it is possible to separate the official State Security interrogation occasioned by Angoucheva's political activism from the sexual assault by the government interrogator that immediately followed it. I would expect the Board to consider, in other words, the seemingly sensible argument that Angoucheva has made throughout these proceedings—that the sexual assault was inextricably linked to the Bulgarian government's disapproval of her Ilinden activities and that

---

1. The finding could also mean, however, that the sexual assault was being viewed only as an isolated incident, and that it was insufficient to establish a pattern or practice of persecution. Yet the applicable regulations suggest that if an applicant already has been singled out for persecution in her country of origin, then a "pattern or practice" showing is not required. 8 C.F.R. §§ 208.13(b)(2)(i)(A) & 208.16(b)(3).

2. According to the INS,

> [t]here is no compelling evidence to establish that the Major harmed the Petitioner because of her political opinion or ethnicity. Nor is there compelling evidence to show that the Bulgarian government promoted or condoned the Major's act. Rather, the evidence supports the inference that the Major found the Petitioner sexually attractive.

(*Id.* at 788.) The Service also does not find it particularly important that the assault occurred in the course of an official interrogation:

> Nor does the fact that the Major sexually assaulted the Petitioner at the same time that she was being interrogated for her political activities, compel[ ] the conclusion that the assault was politically motivated. The Major may have assaulted Petitioner for other reasons, including for example the fact that he found her attractive.

(*Id.* at 791.)

Like Angoucheva, I was taken aback by the argument that a sexual assault like this one could be attributed to sexual attraction alone. Rape and sexual assault are generally understood today not as sexual acts borne of attraction, but as acts of violent aggression that stem from the perpetrator's power over and desire to harm his victim. *See, e.g., United States v. Powers*, 59 F.3d 1460, 1465–66 (4th Cir.1995) (collecting authorities), *cert. denied*, —— U.S. ——, 116 S.Ct. 784, 133 L.Ed.2d 734 (1996); *United States v. Hammond*, 17 M.J. 218, 220 n. 3 (C.M.A.1984) (one of the "common misconceptions about rape is that it is a sexual act rather than a crime of violence."); United Nations High Commissioner for Refugees ("UNHCR"), Sexual Violence Against Refugees: Guidelines on Prevention and Response, at 1 (Geneva 1995) ("Perpetrators of sexual violence are often motivated by a desire for power and domination. Given these motivating forces, rape is common in situations of armed conflict and internal strife.... Like other forms of torture, it is often meant to hurt, control and humiliate, violating a person's innermost physical and mental integrity."). I was therefore somewhat surprised that a division of the United States Department of Justice would take a different view. Perhaps the INS merely meant to suggest that the record in this case would support the conclusion that Major Beltchev personally abused the power vested in him as an officer of the Secret Police and that the Bulgarian government neither sponsored nor condoned his actions. *See, e.g., In re Kasinga*, Interim Decision 3278 (BIA June 13, 1996) (Board recognizes that "persecution can consist of the infliction of harm or suffering by a government, or persons a government is unwilling or unable to control"). That is a slightly more defensible position than suggesting that the authority and power Beltchev held over Angoucheva as a State Security officer had nothing to do with his decision to assault her sexually.

it would not and could not have occurred but for those activities.

Finally, this does not strike me as a case like *Klawitter v. INS,* 970 F.2d 149 (6th Cir.1992), to which the Service directed our attention for the first time at oral argument. In that case, a colonel in the Polish secret police had made advances toward the petitioner on a number of occasions, indicating that he wished to have her as his paramour. *Id.* at 152. When the petitioner repeatedly resisted those advances, the colonel forced himself on her and threatened to destroy her career. The Board determined that the petitioner had not suffered persecution on account of her political opinions so as to make her eligible for asylum, and the Sixth Circuit agreed, noting that the petitioner herself had asserted "persecution" only "by a man who was interested in her sexually" while conceding that her "personal issue does not have anything to do with the government or change of government." *Id.* (internal quotation omitted). The persecution claim advanced by the petitioner in Klawitter bears little resemblance to that pressed by Angoucheva here.

Indeed, it seems to me that Angoucheva's claim is more like that of the petitioner in *Lazo–Majano v. INS,* 813 F.2d 1432, 1436 (9th Cir.1987), where the Ninth Circuit found as a matter of law that the petitioner had suffered persecution on account of a political opinion. Although Lazo–Majano was not herself politically active, her husband had been a member of a rightist paramilitary group that was distrusted by El Salvador's government. Months after her husband fled the country, Lazo–Majano was raped and otherwise abused by a sergeant in the Salvadoran military (Sergeant Zuniga), whom she had known since childhood and for whom she had recently begun to work as a domestic. The sergeant threatened to report Lazo–Majano as a "subversive" if she were to tell anyone of his actions, and then indicated that he personally would kill her. *Id.* at 1433. Under those facts, the Ninth Circuit rejected an argument similar to that of the INS here—that the persecution was personal to the sergeant and that it could not be linked to the petitioner's political opinion:

Persecution is stamped on every page of this record. [Lazo–Majano] has been singled out to be bullied, beaten, injured, raped, and enslaved.... The persecution has been conducted by a member of the Armed Force, a military power that exercises domination over much of El Salvador despite the staunchest efforts of the Duarte government to restrain it. Zuniga had his gun, his grenades, his bombs, his authority and his hold over [Lazo–Majano] because he was a member of this powerful military group.

\* \* \* \* \* \*

[Lazo–Majano] has suffered persecution because of one specific political opinion Zuniga attributed to her. She is, she has been told by Zuniga, a subversive.... If she complained of Zuniga, she was informed, she would be killed as a subversive. One cannot have a more compelling example of a political opinion generating political persecution than the opinion that is held by a subversive in opposition to the government.

*Id.* at 1434–35.

Angoucheva has relied on *Lazo–Majano* as support for her past persecution claim since the inception of these proceedings, yet neither the IJ nor the Board have addressed that decision in finding that she failed to establish a pattern or practice of government-inspired persecution. The Service also made no attempt to distinguish *Lazo–Majano* in its briefs to this court, although it cannot deny that the case would seem to be highly relevant to Angoucheva's current claim. Although Angoucheva suffered but one sexual assault, as opposed to the repeated rapes and abuse endured by Lazo–Majano, the link between that assault and Angoucheva's political opinions would seem more direct than the link found to exist in *Lazo–Majano* as a matter of law. Angoucheva's reliance on Lazo–Majano therefore raises important and difficult questions that I would expect the Board to address. *See also, e.g., Lopez–Galarza v. INS,* 99 F.3d 954, 960 (9th Cir.1996) (finding that petitioner had been persecuted on account of political opinion when she had been imprisoned and raped as a result of her perceived opposition to a

governing political regime); *In re D–V–*, Interim Decision 3252 (BIA May 25, 1993) (approving asylum application where applicant had been gang-raped and beaten by Haitian soldiers who believed she was a supporter of deposed President Aristide).

In the end, I believe that a reasoned treatment of Angoucheva's asylum application, particularly her reliance on the sexual assault by a State Security officer in the course of an official interrogation about her political activities, requires something more than the dismissive single-sentence "observation" given it by the IJ and the Board here. *See, e.g., Hengan*, 79 F.3d at 63; *Bastanipour v. INS*, 980 F.2d 1129, 1132 (7th Cir.1992). I for one am not convinced that the Board would view Angoucheva's application in the same way if it eliminated the irrelevant considerations highlighted by the immigration judge and truly grappled with the difficult issues that Angoucheva actually raises. *See Hengan*, 79 F.3d at 64; *cf. Urukov v. INS*, 55 F.3d 222, 230 (7th Cir.1995) (affirming order deporting member of different Ilinden organization, but urging Board, "in the strongest terms possible, to re-examine" the petitioner's application for asylum). With these additional observations, then, I join the court in vacating the Board's order and in remanding for further proceedings.