**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1023n.06

No. 10-4438

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

***Sep 21, 2012***

DEBORAH S. HUNT, Clerk

| | |
|---|---|
| BEATRIZ AGUILAR;<br>ANDRES EDUARDO GIRALDO;<br>JESSIKA SIRLEY REAL,<br><br>    **Petitioners,**<br><br><br>v.<br><br>ERIC H. HOLDER, JR.,<br>Attorney General,<br><br>    **Respondent.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

On the right side:

**ON PETITION** FOR REVIEW
OF AN ORDER OF THE BOARD
OF IMMIGRATION APPEALS

**O P I N I O N**

---

**BEFORE:  BATCHELDER, Chief Judge; NORRIS and STRANCH, Circuit Judges.**

**ALAN E. NORRIS, Circuit Judge.**  Beatriz Aguilar, a citizen of Colombia, seeks review of a Board of Immigration Appeals ("the Board") decision that affirmed the denial of her requests for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  Petitioner's initial asylum application stated that she sought asylum based upon the fact that her father was a landowner who had been targeted by the Revolutionary Forces of Colombia ("FARC"), a guerrilla organization associated with drug trafficking and a long-term opponent of the Colombian government.  However, at a subsequent hearing before an immigration judge, petitioner amended her application and testified that her father was, in fact, a member of the FARC and had been targeted by a rival faction within the organization. Because of this significant shift in testimony, the immigration judge found that petitioner lacked

credibility and therefore denied her all forms of relief. The Board affirmed that decision and dismissed petitioner's appeal.

**I.**

Petitioner and her two children, who have filed for derivative relief, entered the United States as non-immigrant visitors on October 13, 2000. In November of 2001, she filed an application for asylum, withholding of removal, and protection under the CAT. In that application, which was prepared in Miami by a Spanish-speaking attorney, she gave the following basis for her asylum claim:

> My family is being persecuted by the guerrilla groups in Colombia. My father is a farmer there and the guerrilla group is requesting money from him for their political activities and their war. My father does not believe in the guerrilla movement or their ideas, but he has been threatened and members of my family have been killed. They have killed one of my sisters and two of my brothers.
>
> I lived in Italy for a while, when I was married to an Italian. However when I divorced him because he mistreated me and my daughter, I had to return to Colombia.
>
> As soon as I got there my father told me that he was not able to protect me or my children from the guerrilla[s], who were threatening him because he refused to help them. He told me that I must leave the country.
>
> I knew that I was not able to relocate to another part of the country, since my brothers were killed after they tried to hide. Since I had a U.S. tourist visa, I decided to come to this country, so that my children and myself are safe. The guerrilla[s] consider me their enemy, since my father opposes their political activities. They will harm me or my children in order to make my father comply with their demands for cooperation and support.

In the application she also checked "no" when asked if any member of her family belonged to a guerrilla organization.

After submitting this application, an asylum officer interviewed petitioner, noted that her testimony was "deemed credible," but denied her application as untimely. Because of this decision, petitioner and her children were served with Notices to Appear, which charged them with being removable from the United States. At a hearing later that year in Orlando, she conceded that she and her children were, in fact, removable. The years passed and three additional hearings occurred. The last of them was held in Memphis on December 22, 2008.

At the December 22nd hearing, petitioner was permitted to amend her application. In the revision, she changed her answer to the question, "Why are you seeking asylum?" She wrote, "My father is a member of FARC." She added that her godmother's children had been killed. She also indicated that her father had been jailed after her mother's death.

She expanded upon these changes in her testimony. She stated that her father "was among the higher ups" in the FARC. She speculated that her father was "aligned with some group" but they disagreed and he formed his own faction.

According to petitioner, in 1986 her older sister Isabella was assassinated by an element of the FARC. Then, two years later, two of her brothers were executed on their way to an agricultural show. The police "thought it was someone that had to do with my father . . . [because] they wanted most of the members of my family to disappear." The police suggested that the family hire bodyguards and also referred them to a psychologist for counseling.

Time passed and, in 1990, petitioner gave birth to her daughter, Jessika Real, and, in 1996, to her son, Andres Giraldo. The year after her son was born, petitioner moved to Italy so

that her "children wouldn't have to go through the same things I had lived through." She married in Italy but divorced after a year and a half.

She returned briefly to Colombia in 2000 with her children and lived next door to her mother. After her return, the two sons of her godmother were assassinated. At the funeral, a close friend from childhood who was a member of the FARC told her "that he knew that FARC wanted my family to disappear totally." As a result, she came to the United States on a temporary visa in October 2000.

In 2002, petitioner learned that her mother had been murdered: she had been beaten and her throat was cut. Petitioner was told, and believed, that her father killed her mother because she objected to his involvement with the FARC. Petitioner testified that he was put in jail "for a few days" after the murder. She speculated that he paid off an official to avoid prosecution.

The next year, her younger brother, Jairo, was shot and killed. Another brother, Armando, was kidnaped in 2004 and has not been seen since. Petitioner has two remaining siblings: a sister, Claudia, who is in a government-sponsored program for victims of violence, and a brother, Luis Alfonso, who is a member of the FARC.

She also testified that she had heard of a massacre perpetrated by the FARC in 2004 in which 45 people were killed. She was told that her father was "part of it." When asked what would happen to her if she were to return to Colombia, she said that "they would either kidnap my children or they would kill me" because of her father.

On cross-examination, the government focused on the inconsistencies between petitioner's original and amended asylum applications. She conceded that her lawyer who helped her prepare her asylum application spoke Spanish. At the subsequent interview with the asylum officer, which her attorney did not attend, she explained that she and the officer had difficulty communicating. When asked if she told the officer that her father was a member of the FARC, she stated that "my father was not in very good company, was not keeping very good company, but we had a problem understanding each other." She also said, "I didn't say anything [about her father's affiliation with the FARC] because my mother and brothers were still alive, and also because there wasn't a complete understanding with the lady that was doing the interview."

After the hearing, the immigration judge delivered an oral decision. He recited the testimony summarized above before making his factual findings. First, he disagreed with the asylum officer's conclusion that the asylum application was time-barred, a decision that is not before us. Second and more importantly, he found the petitioner was not credible:

> [W]e have the respondent changing the theory of her case and the basis of her claim diametrically between the time that she filed her application and the time that she testified in Court. . . . Respondent testified to a moral certainty that her father was involved in the FARC and said that she knew that he was involved in the death of her mother. If such was the claim, it certainly was not articulated before the asylum officer or in her original application in 2001 and 2002 . . . . Respondent's explanation that maybe somebody did not fully understand her Spanish or [her original attorney's] secretary was not able to interpret adequately at the firm fails because the application itself is signed by Mr. Cabrera as the preparing person . . . . Respondent chose the interpreter [at the asylum interview] and so her objections to the quality of that interpretation are somewhat disingenuous.

. . .    At bottom, respondent has made two different assertions over time:  one, that her father feared the FARC because he opposed their activities and opposed their aims; and the other one, that her family members were killed because of factional differences within the FARC.  The discrepancies do go to the heart of the case and respondent has not given us an explanation for why she changed her testimony over time.

The testimony makes little sense when viewed in the context of FARC claims. The FARC is a left-wing organization that traditionally . . . recruits from the lower members of the socio-economic classes in Colombia, not from wealthy landowners. The respondent testified that her father was a wealthy man, that he ran a real estate company, that he had property in different parts of Colombia and that he made money and . . . would appear to be the kind of victim that the FARC would naturally be looking for as somebody who was well off and somebody who had made a success in Colombia's economy.

For respondent, then, to say that her wealthy landowner father was a high operative or high official in FARC is really to test the limits of plausibility. Respondent's initial story would generally be sufficient to win relief before this Immigration Judge.  This Immigration Judge has a well-documented history of granting applications either for asylum or withholding [of removal] for those persons who might have been targeted by FARC operatives because they were well off and, thus, belonged to a particular social group consisting of wealthy Colombians who might have been unable to resist the FARC.

Perhaps respondent changed her story in response to a misapprehension on her part of some recent changes by the Board of Immigration Appeals. Yet, the change could not be more stark and gives the Immigration Judge very little confidence in the story that is now put forward, because it is at such variance with the story that was made before the asylum officer and in the I-589. Thus, the Immigration Judge finds that respondent's credibility is so suspect that he cannot credit respondent's testimony.

Having made his factual findings, the immigration judge went on to make two conclusions of law.  First, he found that, even if her testimony were "completely credible," petitioner did not suffer any persecution in Colombia.  Second, he concluded that she was ineligible for relief:

- 6 -

"boiled down to its essentials, the Immigration Judge notes that while the deaths have been corroborated, the nexus has not been adequately proven by external corroboration."

The Board dismissed her appeal. It noted that credibility determinations are reviewed for clear error and that "respondents are attempting to change the entire basis for their claim," not, as they maintained below, making "minor" changes to their asylum application. With respect to the reasons advanced by petitioner to explain the changes in her application, specifically problems communicating in English, the Board had this to say:

> The lead respondent . . . argues that there were problems communicating with the asylum officer at the interview. We note, however, that she attended the asylum interview with her own interpreter. Further, the unamended first asylum application, supported by her testimony at the interview, was prepared with the help of an attorney who spoke Spanish and his Spanish speaking assistant. The lead respondent's attempts to distance herself from this application are unavailing. We similarly find little merit in her claim that she was reticent to testify about her father's activities. This is not a situation where she was interviewed upon entry into the United States. Rather, she contacted an attorney, worked with him on the presentation of her case and then appeared before an asylum officer, all while claiming she faced persecution due to her father's opposition to FARC.

## II.

### 1. Petitioner's Asylum Claim

Under the Immigration and Nationality Act ("INA"), the Attorney General and the Secretary of Homeland Security have discretionary authority to grant asylum. 8 U.S.C. § 1158(b)(1). To qualify for such relief, an applicant must be a refugee as defined by the INA.[1]

---

[1] The statute provides as follows:

If an applicant is found to have suffered past persecution she is presumed to have a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). However, the burden rests with the applicant to show a well-founded fear of future persecution if she has not established past persecution. *Id.*

This court has consistently reiterated that we review factual findings, including the finding of an applicant's credibility, under the substantial evidence standard. *Abdurakhmanov v. Holder*, 666 F.3d 978, 982 (6th Cir. 2012); *Ben Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007). Such findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). However, the credibility finding must go to the heart of the claim and not be "based on an irrelevant inconsistency." *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004). Moreover, "if discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Abdurakhmanov*, 666 F.3d at 982 (quoting *Ceraj v. Mukasey*, 511 F.3d 583, 591 (6th Cir. 2007)). The credibility determination is particularly important for one reason: if the applicant's testimony is deemed credible, then it "may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a).

---

The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42).

Petitioner refers us to a Seventh Circuit case in which the petitioner there submitted a bare bones asylum application without the help of counsel and then appeared before the asylum officer with a woman from her church to act as translator only to discover that this woman did not speak the same dialect and hence could not provide accurate translation. *Angoucheva v. I.N.S.*, 106 F.3d 781, 783 (7th Cir. 1997). Petitioner later filed a second, more complete application, which detailed the substance of her claims, including a sexual assault by a police officer. As in our case, the government pointed to her first application to make the argument that the later application lacked credibility. *Id.* In remanding the matter for further proceedings, the Seventh Circuit faulted the immigration judge for not fully considering the allegations made by the petitioner in her later application. *Id.* at 789-90. In our view, *Angoucheva* is not particularly helpful to petitioner for three reasons: first, the immigration judge in that case did not conclude that petitioner lacked credibility, *id.* at 784; second, the two asylum applications were not inconsistent: the second simply provided much more detail; and, third, unlike our case, petitioner was not assisted by counsel who spoke her own language when preparing her first application.

Petitioner takes the position that her first and second asylum applications were not inconsistent. The second application merely "more fully reflects her experience in Colombia" but did not change her theory of the claim. In both applications she asserts that her father's relationship to the FARC is the basis for her claims for relief.

- 9 -

We are not unsympathetic to petitioner's situation. As the IJ recognized, the record makes abundantly clear that her family has suffered considerable violence in Colombia. That said, it is equally clear that petitioner's testimony is critical in establishing her entitlement to relief. Although the record contains documentary evidence that corroborates violence against family members, her testimony is crucial to establishing that this violence represents the kind of persecution that triggers protection under the INA. Unfortunately for her, that testimony was deemed incredible by the IJ and by the Board. Substantial evidence supports those judgments and, as cited earlier, they are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Petitioner falls short of meeting that difficult standard for reversal. The role that her father played in the family's relationship to the FARC not only goes to the heart of her claim, it is the crux of her claim. Her testimony with respect to the role he played changed completely during the course of these proceedings and none of the reasons offered by way of explanation are compelling, at least to the extent necessary for us to second-guess the IJ's credibility assessment. The documentation submitted by way of corroboration, which includes an unsworn statement from her sister, Claudia, and statements from various governmental offices in Bogota, including those of the Public Prosecutor, affirm that petitioner and her family have suffered violence at the hands of insurgent groups. However, as the immigration judge observed, these documents do not—absent petitioner's testimony— establish that the family was targeted based upon a protected category. For these reasons,

petitioner has failed to demonstrate that she is entitled to either asylum or withholding of removal.[2]

Given the centrality of petitioner's testimony to her asylum application and our own highly deferential standard of review with respect to credibility assessments, we are obliged to affirm the denial of her asylum application.

In the alternative, petitioner contends that she is eligible for humanitarian asylum. In *Matter of Chen*, 20 I. & N. Dec. 16 (BIA 1989), the Board carved out a "humanitarian" exception to the "fear of future persecution" requirement imposed on applicants. In certain cases of "severe" past persecution, the Board stated that "there may be cases where the favorable exercise of discretion is warranted for humanitarian reasons even if there is little likelihood of future persecution." *Id.* at 19; *see also Ben Hamida*, 478 F.3d at 740. This exception has been incorporated into the regulations. 8 C.F.R. § 1208.13(b)(1)(iii)(A) ("The applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution").

This claim also fails. Because we have affirmed a finding that petitioner failed to establish past persecution, she is not entitled to this extraordinary form of relief. *Ben Hamida* at 741.

---

[2]Petitioner addresses her withholding of removal claim only in passing. Because petitioner has failed to establish her eligibility for asylum, she cannot satisfy the more stringent standard for withholding of removal. *Koliada v. INS*, 259 F.3d 482, 489 (6th Cir. 2001).

*2. Petitioner's CAT Claim*

Under the CAT, an individual may not be deported if "it is more likely than not that [the individual] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). As with asylum claims, the "testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." *Id.* Torture is "an extreme form of cruel and inhuman treatment." 8 C.F.R. § 1208.18(a)(2). It is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted" for several reasons, including punishment, intimidation or coercion, "when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1).

The immigration judge rejected petitioner's claim because she had failed to show "that the government of Colombia is involved in any effort to torture family members." To the contrary, the immigration judge concluded that the testimony revealed that the government had "provided some assistance to the family within the limited means available during that period of time." He went on to note that the events complained of took place some years ago and also found that there was nothing to support petitioner's contention that "the government of Colombia will acquiesce or turn a wilfully blind eye to her plight." For its part, the Board disposed of the claim in a single sentence: "[W]hile recognizing the difference in eligibility criteria, the evidence of record fails to establish a *prima facie* case for eligibility for relief under the Convention Against Torture."

We affirm on the basis articulated by the IJ. Particularly in light of the fact that her own testimony lacks credibility, petitioner has failed to establish that, upon her repatriation, the Colombian government would torture her or would acquiesce in her torture by FARC.

## III.

The petition for review is **dismissed.**