**Gueorgui P. URUKOV, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 94–2535.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1994.

Decided April 17, 1995.

---

Kimball R. Anderson, Marie A. Lona (argued), Winston & Strawn, Martina M. Keller, Kempster & Associates, Chicago, IL, for Gueorgui P. Urukov.

Janet Reno, U.S. Atty. Gen., Washington, DC, A.D. Moyer, Samuel Der–Yeghiayan, I.N.S., James B. Burns, Office of the U.S. Atty., Chicago, IL, Robert Kendall, Jr.,

Thomas W. Hussey (argued), David M. McConnell, U.S. Dept. of Justice, Civil Div., Immigration Litigation, Washington, DC, for I.N.S.

Before BAUER, BRIGHT * and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Petitioner Urukov seeks review of a decision by the Board of Immigration Appeals ("BIA") of deportation to his native country, Bulgaria. On December 2, 1992, deportation proceedings were initiated against Urukov with an order to show cause alleging that he was in violation of 8 U.S.C. § 1251(a)(1)(B) [1] because his visitor's visa had expired. On August 19, 1993, an Immigration Judge ("IJ") found that Urukov was deportable and ineligible for relief under the asylum or withholding of deportation provisions of the Immigration and Nationality Act ("the Act"). 8 U.S.C. §§ 1158(a) and 1253(h). The IJ granted Urukov's alternative request for voluntary departure from the United States. Urukov appealed the IJ's decision to the BIA and the BIA adopted and affirmed the IJ's decision. Urukov petitions for review of the BIA's affirmance. We deny the petition and affirm the decision of the BIA.

## I. FACTUAL BACKGROUND

Gueorgui Petrov Urukov is a 27 year old citizen of Bulgaria and is of Macedonian descent.[2] He obtained a visitor's visa to the

---

* Hon. Myron H. Bright, Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

1. 8 U.S.C. § 1251(a)(1)(B) provides, in relevant part:

   Any alien ... in the United States in violation of this chapter or any other law of the United States is deportable.

2. In the late nineteenth century, when the Ottoman Turks began relinquishing control over Macedonia, the territory was divided into four parts and incorporated into Bulgaria, Albania, Greece and Serbia. In Bulgaria, it is estimated that there are over one million people whose ancestors lived in Macedonia. A large majority of these people live in the Pirin region.

   The official position of the Bulgarian government is that these people are all ethnic Bulgarians. A small, but vocal, minority of these people assert that they are Macedonians. This minority claims that those who identify themselves as Macedonians would be larger in number if the Bulgarian government did not repress their rights and punish those who espouse a Macedonian consciousness.

   In 1991, the Helsinki Watch, a committee of Human Rights Watch, reported that the Bulgarian government frequently violated the human rights of Macedonians. The violations include: refusing to register Macedonian cultural groups; detaining members of these groups who were engaged in peaceful meetings; prohibiting members from gathering signatures on petitions in support of Macedonian rights; confiscating passports of members of these groups; and harassment by the State Security. News from Helsinki Watch, "Destroying Ethnic Identity: Selective Persecution of Macedonians in Bulgaria," February 12, 1991.

United States in early 1991, which authorized him to remain in the United States until October 9, 1991. On May 9, 1991, he left Bulgaria and in June, 1991, Urukov applied for asylum in the United States without the assistance of counsel. The Immigration and Naturalization Service ("INS") denied his application for asylum because, in their opinion, he failed to establish that he had a "well-founded fear of persecution" should he return to Bulgaria, and on December 2, 1992, began deportation proceedings against Urukov and issued an order to show cause charging him with having remained in the United States after his visa had expired. At a deportation proceeding on March 3, 1993, Urukov appeared with counsel and admitted the allegations in the order to show cause. The IJ found that he was deportable and adjourned the proceedings in order that Urukov might have an opportunity to re-apply for asylum. With the assistance of counsel, Urukov submitted a second application on April 14, 1993, and on August 19, 1993, he appeared before the IJ, with counsel, and requested asylum. Prior to and during this hearing, Urukov presented a long and detailed familial and personal history, both orally and in writing, in support of his application for asylum and withholding of deportation which we summarize in order to facilitate our review of the BIA's decision to deny his petition.

Urukov was born in Pirin, Bulgaria, a Macedonian area, where his family is well-known for its support of Macedonian rights after the Communists rose to power in Bulgaria. His entire family, dating back to his great-grandfather, all resisted Bulgarian attempts to assimilate Macedonians and to eradicate Macedonian culture and heritage in that area. According to the petitioner, Urukov's grandfather was murdered as part of his resistance, and to this day, he is considered an "enemy of the people." Many of Urukov's older relatives were members of VMRO–Ilinden, an illegal underground movement and organization that espoused the cultural and ethnic independence of the Macedonian people. Urukov joined VMRO–Ilinden in 1988.

Urukov was raised with a strong sense of Macedonian pride and claimed to have begun performing acts of civil disobedience at an early age. In elementary school, he resisted efforts at Communist indoctrination by refusing to wear the red scarf that all students were required to wear because it symbolized mandatory membership in the Communist youth organization. He claimed that his teachers taught him that his relatives were disgraces to Bulgarian history, and when he protested to these characterizations, he was beaten by his teachers. Urukov also stated that in spite of the fact that he had the highest grades in his class, he was denied admission to the University of Sophia on two occasions.

Urukov began two years of mandatory military service after he graduated from the equivalent of a Bulgarian high school (gymnasium). He was assigned to a special camp in Vidin, a town far from his home village, one he claims was reserved for Turks, Macedonians and Gypsies, all of whom were classified as "undesirable" ethnic groups. Urukov also claims that this camp served as a re-education center where the soldiers spent half of each day being indoctrinated with Bulgarian political propaganda. He resisted all attempts at assimilation and indoctrination, and after fighting with other soldiers over his family's history of civil disobedience, Urukov was jailed for fifteen days because the officers thought he was an "anarchist."

Urukov's second year of military service was spent at Kozarsko, another town far from his home village, where he was forced to serve double shifts, doing construction labor during the day, and guard duty at night. He claimed that he was forced to work double shifts so that he would become tired and fall asleep on the job, thereby qualifying him for further punishment. Although he completed two full years of service, Urukov was required to remain in the military for an additional four months. Although Urukov's commander told him that his service was extended because the army needed more soldiers, he considered the extra time to be punishment for his civil disobedience and non-acquiescence to the Communist party.

When Urukov returned home after his military service, the government did not allow him to work as an electrician, the trade he was trained for in high school. Rather, he was assigned to be a farmer and a tract of land near his home village was designated for his use. Urukov rejected this assignment and moved to Blagoevgrad where he worked as an electrician without authorization from the government. After eight months, the authorities discovered that he was working as an electrician and "deported" him back to his home village in Pirin.

Urukov then began maintaining two homes, one in his home village and one in the larger town of Sandansky, where he was able to find unauthorized work as a waiter. He claimed to have increased his activities on behalf of VMRO–Ilinden at this time, including participating in the planing of meetings and rallies. In 1988, Urukov claimed to have participated in a drive to collect signatures of ethnic Macedonians in recognition of the Macedonian identity and in opposition to the Bulgarian government's failure to recognize their rights. After several months of collecting signatures against the Bulgarian non-recognition of Macedonian rights and identity, Urukov claimed that his house was raided, the signatures confiscated, and his employer at the restaurant was pressured by the police to fire him. Urukov stated that at this time, he ceased working and became involved in VMRO–Ilinden activities on a full-time basis, including the organizing of public rallies in support of Macedonian independence. His parents supported him financially while he worked on behalf of VMRO–Ilinden.

One such rally held in August, 1990, was broken up by police officers using teargas and dogs. Urukov was present at this rally but he escaped immediate arrest. Once he returned to his home in Sandansky, however, he found that his apartment had been raided, presumably by the police, and he was arrested and held in custody for one full day. During this detention, Urukov claimed that he was interrogated about his VMRO–Ilinden

activities and beaten. Although Urukov was able to return to his home and to continue his VMRO–Ilinden activities after this arrest, he claimed that it frightened him so much that he realized he must leave Bulgaria as soon as possible. He obtained his visitor's visa to the United States shortly thereafter, as part of an excursion package, and left Bulgaria on May 9, 1991, leaving his wife behind, who was eight months pregnant with their daughter.

Upon entering the United States, Urukov, who spoke no English, proceeded to file an application for asylum on the basis of his opposition to "Bulgarian communism." He did so without the aid of counsel, although he did have assistance from another Macedonian residing in the United States. Urukov claimed that this person told him not to mention that he was Macedonian because his wife, who was still in Bulgaria, would be unsafe if he stated that he was persecuted because of his ethnic identity. As a result, his application contained no information about his Macedonian descent or activism.

In the meanwhile, Urukov's wife, who was still living in Bulgaria, was questioned by the police several times about Urukov's absence from the country. She alleged that after a great deal of police harassment, she too decided to leave Bulgaria and entered the United States on a student visa. She left their daughter in Bulgaria with Urukov's parents, who, according to Urukov, also claim that they are being harassed by the police.

In support of his second request for asylum, Urukov submitted a personal statement, official Bulgarian documents about his family's history, a Helsinki Watch report about the persecution of Macedonians in Bulgaria, his VMRO–Ilinden membership card, which he obtained in April, 1991,[3] various newspaper articles about the treatment of Macedonians in Bulgaria, and evidence that mail to and from his family had been opened and read before it reached its destination. At his asylum hearing, Urukov testified on his own behalf and stated that his parents were being threatened by the government that unless

---

**3.** Urukov and his wife testified that VMRO–Ilinden only began issuing membership cards shortly before he obtained one.

they adopted Urukov's daughter, she would be placed in an orphanage. Additionally, his father was fired from his job and Urukov stated that he was fired because of Urukov's activities on behalf of VMRO–Ilinden. His wife also testified as to how the government harassed her husband, how it had been harassing her in his absence, and that she feared for her husband's safety if he was forced to return to Bulgaria.

The IJ denied Urukov's request for asylum, stating that while he believed that Urukov had a subjective fear of possible persecution should he be forced to return to Bulgaria, he did not have an objective well-founded fear of persecution required for asylum. The IJ found that with the possible exception of the one-day detention after the August, 1990 rally, Urukov had not faced, nor would he face persecution should he return to Bulgaria. Furthermore, the IJ found that Urukov's activities on behalf of VMRO–Ilinden did not rise to the level of activism that would render him a target for persecution should he return. Lastly, the IJ found that Urukov failed to establish that Macedonians were a persecuted social group in Bulgaria. The BIA affirmed and adopted the IJ's decision and Urukov filed a petition for review of the BIA's decision.

## II. DISCUSSION

This case presents us with the issue of whether the BIA erred when it found that Urukov presented neither substantial evidence of a well-founded fear of persecution in support of his request for asylum, nor a clear probability of persecution should he be forced to return to Bulgaria in support of his request to withhold deportation.

### A.

The Attorney General has discretion to grant asylum to "refugees," 8 U.S.C. § 1158(a). "Refugees" are defined as people who are unwilling to return to their native countries "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). While the Act does not define "persecution," this court has

defined it as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *DeSouza v. INS,* 999 F.2d 1156, 1158 (7th Cir.1993) (citation omitted); *see also, Balazoski v. INS,* 932 F.2d 638, 642 (7th Cir.1991) (definition of persecution includes, at minimum, conduct that threatens life or freedom).

Whether a person is a "refugee" is a factual determination that we review under the substantial evidence test. *Sivaainkaran v. INS,* 972 F.2d 161, 163 (7th Cir.1992). This is a deferential standard and one that requires that we uphold the BIA's determination if it is "supported by reasonable, substantial, and probative evidence on the record as a whole." 8 U.S.C. § 1105a(a)(4). We may reverse the BIA's determination only if the evidence "was such that a reasonable fact-finder would *have* to conclude that the requisite fear of persecution existed." *INS v. Elias–Zacarias,* 502 U.S. 478, 480, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992) (emphasis added). Review of the BIA's conclusions of law and its interpretation of the Act is *de novo. Kaczmarczyk v. INS,* 933 F.2d 588, 593 (7th Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991).

To prove his well-founded fear of persecution, an alien must not only show that his fear is genuine, but that it is a *reasonable* fear. Although the Supreme Court has declined to define 'well-founded fear,' this court has consistently held that in order to demonstrate a well-founded fear, a petitioner must present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution.

*Milosevic v. INS,* 18 F.3d 366, 370 (7th Cir. 1994) (emphasis in original).

We begin by examining Urukov's contention that the BIA merely "rubber-stamped" the IJ's decision rather than conducting the "meaningful" review of the record it should have conducted. The BIA specifically stated that it had "carefully and thoroughly reviewed the record of the proceedings in this case, the immigration judge's decision, the respondent's appellate brief, and supporting affidavits and exhibits." Af-

ter doing so, it adopted the IJ's decision and affirmed based on the reasons set forth in his decision. While Urukov feels that this review was insufficient,

> [a]ll our decisions require . . . is that the BIA's decision "reflected that 'it has heard and thought and not merely reacted.' " The BIA "has no duty to write an exegesis on every contention." . . . Although we have urged the BIA "to explain its decisions in greater detail so that we may be confident it has given an appeal due consideration," we have held that the BIA adequately explains its decision when it adopts a decision of the IJ. If the BIA adopts the reasoning of the IJ, however, the IJ's analysis is the sole basis for our review[.]

*Cuevas v. INS,* 43 F.3d 1167, 1170 (7th Cir. 1995) (citations omitted). Thus, the BIA committed no error in adopting the IJ's decision and we will use the IJ's opinion as the basis for our review of Urukov's petition.

■ Urukov's claims fail to reach the level of "persecution" as it is defined by this court. Most fatal to his claim is the fact that he has "failed to present *specific evidence* that his encounters with the government were of such a 'magnitude or frequency' that they would cause a reasonable person to fear being singled out for prosecution, and to demonstrate that his fear of persecution pertained to him individually rather than to the population." *Sivaainkaran,* 972 F.2d at 165 (emphasis in original). While he does paint a picture of Macedonians being treated as "second-class citizens" by the Bulgarian government, we have made it clear that

> political turmoil alone does not permit the judiciary to stretch the definition of "refugee" to cover sympathetic, yet statutorily ineligible, asylum applicants. Immigration policy is in the clear purview of the legislative branch, and Congress has adopted a policy of limited asylum eligibility. The apparatus it has created for implementing that policy rests primarily with immigration judges and the BIA . . . and our role is limited to providing deferential review of BIA decisions. . . . [T]he narrow defini-

tion of refugee—is no doubt driven by Congress' concern that a more lenient and compassionate policy would qualify the entire population of many war-torn nations for asylum.

*Id.* (citations omitted). While we agree with the IJ that Urukov had a subjective fear of returning to Bulgaria, the evidence provided by Urukov simply does not compel a finding of persecution, nor has he shown that he is singled out among his fellow ethnic Macedonians for unfavorable treatment. Thus, he has not established that he has an objectively reasonable well-founded fear of persecution.

■ Urukov, like every other Bulgarian, was obligated to serve in his country's military. Although he was not pleased with where he was stationed, soldiers generally do not have much autonomy over their military assignments. It is true that he was incarcerated for fifteen days during his service, but the punishment was in response to his fighting with fellow soldiers and defiance of military authority. While our sympathies may be aroused by his defense of his family and ethnic heritage, Urukov has presented no evidence to substantiate his claim that his incarceration was anything but an exercise of military discipline. He has similarly failed to present any evidence to support the argument that he was kept in the military for an extra four months as a punishment. His commander's explanation that the service needed more soldiers was not rebutted by any evidence other than Urukov's opinion that he was being punished for his views about Macedonian rights.

■ Furthermore, although Urukov contends that he was not allowed to be employed as an electrician, the trade he learned in school, after his military service he was, in fact, given an opportunity to earn a living as a farmer, but he chose to work in an unauthorized field of employment.[4] We may not like the idea of a government assigning careers, but it does not rise to the level of "infliction of harm" directed only at Urukov that we find "illegitimate" to justify granting asylum.

---

4. The Bulgarian government assigns its citizens to specific trades and locations. Any employ-

ment accepted outside of that field and location is unauthorized.

■ Only two of Urukov's claims of "persecution" occurred during the new military regime in Bulgaria.[5] The first was his detention after the rally in August, 1990. Assuming, *arguendo*, that Urukov was arrested purely to harass him for his political views, a one day detention, during which time he claimed he was beaten, is not, in and of itself, sufficient persecution to compel us to grant a petition for asylum. We have denied asylum in far more compelling circumstances. *See, e.g., Bevc v. INS,* 47 F.3d 907, 910 (7th Cir.1995) (non-Serbian living in Serbia where non-Serbians were the victims of ethnic cleansing); *Sivaainkaran,* 972 F.2d at 164 (petitioner was chased through a field by armed soldiers who were firing at him, and Tamils in Sri Lanka were being detained, tortured and killed); *Kaczmarczyk v. INS,* 933 F.2d 588, 591–92 (7th Cir.1991) (repeated arrests, frequent harassment, denial of passport, and being labeled an "anti-government activist"); *Milosevic,* 18 F.3d at 368 (detention and threats of torture as well as the Secret Police warning the petitioner to never return to Yugoslavia).

As much as we may sympathize with the subjective fears Urukov holds, he was only detained one time by the Bulgarian government. He was never prosecuted for any offense and he was immediately allowed to return to his home and resume work on behalf of VMRO–Ilinden after the detention. By Urukov's own testimony, after his detention he continued to support Macedonian rights in Bulgaria, and he was never arrested or detained again. Although he left the country nine months later, Urukov was left alone for those nine months, and when he did obtain a visitor's visa, he left Bulgaria with a valid passport and the government's permission.

■ The next alleged acts of persecution were not even acts against Urukov, but rather, against his father and daughter. He claims that his father lost his job because of his activism, yet the IJ properly pointed out that Urukov presented no evidence of a nexus between his support for Macedonian rights and his father's employment situation. The fact that Urukov left Bulgaria with the government's permission and a valid passport, once again undercuts his argument that his family was being harassed because of his political views.[6] Had the government been concerned with persecuting Urukov, it would have denied him a visa so that he could not travel abroad to potentially escape persecution. Additionally, the government in Bulgaria provides child support payments to all children for the first two years of their lives. These payments were terminated prematurely for Urukov's daughter, but the fact that neither Urukov nor his wife were living in Bulgaria may very well have been the reason why they were suspended, not Urukov's support of Macedonian rights.

■ The IJ also found that Urukov was not an activist or a leader of VMRO–Ilinden such that he would be singled out for unfavorable treatment. Urukov himself testified that his activities on behalf of VMRO–Ilinden consisted of collecting signatures in support of Macedonian rights and helping to facilitate meetings. By Urukov's own admission, he was too young to be a leader of the organization. His activities as a member of VMRO–Ilinden fall far short of the type of leadership in an organization that would be necessary to make a person a particular target for govern-

---

5. In November, 1989, the hard-line communist government was ousted and the government of Bulgaria began evolving into a parliamentary democracy. Bulgaria's current president, Zhelyu Zhelev, was elected in 1992 for a five-year term. Zhelev is a former dissident and leader of the coalition opposed to the communist government. While VMRO–Ilinden is still an unregistered, illegal organization, TMO–Ilinden, a Macedonian cultural group, is legally registered with the government.

In 1991, the Helsinki Watch reported that there was still wide-spread persecution of Macedonians in Bulgaria. *See* News from Helsinki Watch, "Destroying Ethnic Identity: Selective Persecution of Macedonians in Bulgaria," February 12, 1991. Urukov testified that government reforms in Bulgaria would have no impact on him for he was an activist member of an illegal organization and that Macedonians still face persecution in spite of the overthrow of the communist regime.

6. The Helsinki Watch reported that confiscating citizens' passports in order to preclude them from traveling to other countries was one of the common forms of persecution that the Bulgarian government visited upon ethnic Macedonians. *See, supra,* note 2.

ment persecution. When the IJ questioned Urukov about his activities, he only "spoke vaguely and had difficulty articulating exactly what his activities were." An activist or leader, as Urukov claimed to be, would have far more concrete examples of his leadership activity, and it is unlikely that the Bulgarian government is going to persecute a person who is unable to articulate his involvement in VMRO–Ilinden, because in all probability, that person has no real influence over the direction and activities of the organization.

In short, while Urukov will not have the opportunity to enjoy the freedom or lifestyle choices that we have in the United States when he returns to Bulgaria, neither is he facing the type of persecution in which his liberty or life are objectively threatened. The IJ's decision, as adopted by the BIA, is supported by "reasonable, substantial, and probative evidence," 8 U.S.C. § 1105a(a)(4), and a reasonable fact finder could conclude that Urukov does not have an objectively reasonable fear of being singled out for persecution should he return to Bulgaria. Had we been the trier of fact we may have found the necessary well-founded fear of persecution, but because of our limited scope of review of BIA decisions, we cannot reverse the BIA in this case. Because we are of the opinion that Urukov has presented compelling arguments in favor of his petition, we urge the BIA, in the strongest terms possible, to re-examine Urukov's petition for asylum. In light of our holding that Urukov does not have a well-founded fear of persecution, we need not address whether ethnic Macedonians in Bulgaria are a "particular social group" within the meaning of 8 U.S.C. § 1101(a)(42)(A).

### B.

■ For Urukov to be entitled to withholding of deportation, he would have to establish that his "life or freedom *would be threatened* in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1) (emphasis added). The Supreme Court has held that this language requires the petitioner "to establish by objective evidence that it is more likely than not

that he or she will be subject to persecution upon deportation." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 430, 107 S.Ct. 1207, 1212, 94 L.Ed.2d 434 (1987). The Court has also stated that petitioners must establish that they face a "clear probability" of persecution in the future, *INS v. Stevic*, 467 U.S. 407, 413, 104 S.Ct. 2489, 2492, 81 L.Ed.2d 321 (1984), and we have made it clear that an applicant for withholding of deportation bears an even heavier burden than the applicant for asylum does. *Milosevic*, 16 F.3d at 372.

We have held that Urukov failed to prove a "well-founded fear" of persecution to entitle him to asylum. The same evidence is, therefore, necessarily inadequate to establish the higher "clear probability" of persecution standard necessary for withholding of deportation. *Id.* Accordingly, we affirm the IJ's decision and the BIA's affirmance, that Urukov is ineligible for withholding of deportation.

### III. CONCLUSION

While Urukov's fears about returning to Bulgaria are subjectively real, the BIA has come to the permissible conclusion that he has failed to establish by clear and substantial evidence, that he has an objective fear of persecution should he return to his native country. Additionally, the BIA concluded that Urukov has not proven that it is more likely than not that he will be persecuted upon return. In view of the contents of the record, our limited scope of review of BIA decisions, and our comments about the compelling nature of Urukov's petition, however, we are convinced that a re-evaluation of Urukov's petition by the BIA is in order.

Urukov's petition for review of the BIA's decision not to grant his application for asylum or, in the alternative, for withholding of deportation is DENIED and the BIA's decision is AFFIRMED, subject to our recommendation for re-evaluation of the petition by the BIA.