124 F.3d 203
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Gloria GRAJO and, Geraldine Grajo, Petitioners/Appellees,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent/Appellant.
 No. 96-3894.
 United States Court of Appeals, Seventh Circuit.
 Argued July 8, 1997
Decided Aug. 4, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied Oct. 29, 1997.
 
 POSNER, Chief Judge, CUDAHY, Circuit Judge, and RIPPLE, Circuit Judge.
 
 ORDER
 
 1
 The petitioners, a mother and daughter from the Phillippines, filed a joint application for asylum and withholding of deportation, claiming past persecution and fear of future persecution based on their political beliefs. On appeal, they argue that the Board of Immigration Appeals erred in denying their application, and that the Immigration Judge deprived them of due process during their hearing. Because the BIA's decision is supported by substantial evidence, we affirm.
 
 I. Background
 
 2
 Gloria Grajo and her daughter, Geraldine Grajo, are Filipino citizens now residing in Chicago, having overstayed their visitor visas. After the INS issued Orders to Show Cause against them. they conceded deportability, but requested asylum or withholding of deportation, alleging persecution in the Phillippines based on their political opinions. On March 27, 1995, the Grajos testified to the following facts before an Immigration Judge: Before departing for the United States in 1990, Gloria Grajo lived in Manila along with her husband, her son, and Geraldine. While in Manila, Gloria taught university courses and authored three textbooks about teaching the Filipino language. In addition, since 1980 and until her departure, she served as secretary for the municipal arbitration board (a judicial branch of the government) in her Barangay--a neighborhood, or township, of Manila. In that capacity, she was responsible for maintaining all records for the Barangay's constituents, presenting information and research on the arbitration cases to the chairman and council members of the board, and providing certified records to the court system when arbitration failed.
 
 
 3
 During her term as secretary, Gloria belonged to former President Ferdinand Marcos' political party, the K.B.L. She testified that when Marcos was in power, she was the object of jealousy and envy of the political opponents of the Marcos government. Although the arbitration board's chairman--also a member of the K.B.L.--appointed her as secretary to the board, this appointment had to be approved by the council members, who belonged to the "opposite" party. Gloria explained that if the counsel members belong to the "opposite" party, "they can try to get rid of the secretary." Nevertheless, the counsel approved her appointment even after 1986 when Marcos was deposed from power and succeeded by Corazon Aquino. Gloria testified that her colleagues, though, gossiped about her and attempted to fabricate charges against her because they opposed her appointment. Moreover, she asserted that she was given fewer duties at the university because of her political affiliation. In addition to the difficulties caused by her political affiliation, Gloria Grajo stated that her work for the poor at the Barangay made her a threat to the wealthy.
 
 
 4
 Despite her predicament, Gloria remained in the Phillippines until an event occurred which caused her to flee to the United States. On April 4, 1990, she returned to the Phillippines from a business trip to Singapore and was met at the airport by Mr. Arsenio Dumlao, who, according to Gloria, was an "admirer" wanting to marry her. His affection was unwelcome; she was already married, and she believed that he was an alcoholic and that he was "crazy." Gloria further stated that she feared him because he was very powerful and because the Dumlao family was very important in the Phillippines: Arsenio's brother was a general in the Marcos and Aquino regimes, and is chief of criminal investigations in the town of Came Crane in the Phillippines; Arsenio's uncle is a provincial governor. Gloria also stated that the Dumlao family had connections to the current president of the Phillippines, Fidel Ramos. Although Gloria was not expecting to see Mr. Dumlao at the airport, he approached and embraced her, and forced her to accompany him to a hotel, allegedly telling her he would kill her if she did not cooperate. Gloria testified that Mr. Dumlao raped her several times and attacked her until she lost consciousness. Upon fleeing the hotel, Gloria went directly to the airport to depart for the United States without reporting the crime to anyone. She explained that she did not tell her family because she did not want them to be embarrassed and that Mr. Dumlao threatened to kill her and other members of her family if she reported him to the police. Moreover, she testified that reporting the crime would have been futile because General Dumlao would protect Arsenio Dumlao from any charges.[1]
 
 
 5
 Gloria entered the United States at Detroit, Michigan, and lived with her sister in Chicago, Illinois for approximately one year. She then obtained a Canadian visitor visa and stayed with an aunt in Canada from March 31, 1991 until June 3, 1991 when she reentered the United States. Gloria testified that she decided to reenter the United States after receiving a phone call while she was in Canada from her husband--who was still in the Phillippines--informing her that her sister-in-law had been raped and murdered by "unknown people." Gloria's sister-in-law was a landowner in the Filipino countryside and apparently--although there was no investigation--had been killed over a land dispute with an insurgent organization called the New People's Army (NPA). Because Geraldine Grajo physically resembled her murdered aunt, Gloria explained that she feared for her daughter's safety in the Phillippines. Consequently, Gloria and her husband decided to send Geraldine, then 22-years old, to the United States. As further support of her fear of persecution in the Phillippines, Gloria also stated that her brother-in-law had been murdered in 1981 and that her uncle was murdered in 1987 with little or no investigation by the police.
 
 
 6
 Geraldine also testified before the Immigration Judge. The basis for her application was identical to her mother's. Although she stated that she did not know why her mother could not return to the Phillippines, she explained that she expected it had something to do with the Barangay and her aunt's death.
 
 II. Proceedings Below
 
 7
 The Immigration Judge denied the Grajos' asylum application and claim for withholding of deportation but granted the Grajos voluntary departure in lieu of deportation. The IJ noted that the incidents alleged by Gloria constituted harassment rather than "past persecution," and that neither Gloria nor Geraldine showed a well-founded fear of future persecution based on political opinion. During the hearing, the IJ expressed skepticism about Gloria's rape allegations.[2] For instance, he questioned her ability to know whether she had been raped, noting that as a mother she could not "show that [she had] been violated normally because physiologically [she had] given birth to children," and that she could not know whether her attacker had achieved penetration because she had passed out. Moreover, he displayed gross insensitivity when he made the following statement:
 
 
 8
 How are you a threat? Tell me. You use those words very freely. But what--can you do? You are now a 45 year old woman--now you're 50. And excuse me, but you passed your prime a long time ago. At 45 you lost the loom and the--and your beauty that you once had when you were younger. Now, why would somebody be interested in you in a carnal nature and in a political nature? What do you have that would excite this person to do what he did or is this merely a figment of you imagination in order for you to remain here in the United States.
 
 
 9
 An appeal was taken to the Board of Immigration Appeals. The BIA accepted Mrs. Grajo's account of the rape as true and observed that the IJ "could have demonstrated more sensitivity in his approach." Moreover, the BIA took issue with the U's use of the term "harassment" to describe rape. The BIA stated: "Rape is harm which rises to the level of persecution and, if it is on account of one of the grounds specified in the Act, may form the basis for eligibility for asylum or withholding of deportation" Still, after a de novo review, the BIA held that the Grajos did not qualify as refugees under the Act. It found that Gloria failed to show past political persecution because the rumors and gossip she complained of did not rise to the level of persecution, and because she failed to show a connection between her rape and her political opinions or activity. Moreover, the BIA found that Geraldine had not shown a well-founded fear of political persecution, noting that Geraldine was not a landowner, and was not similarly situated to her aunt.
 
 III. Discussion
 
 10
 The Attorney General is granted the discretion under 8 U.S.C. § 1158(a) to grant asylum to an alien who qualifies as a refugee.[3] Under 8 U.S.C. § 1101(a)(42)(A), "refugee" is defined as one "who is outside any country of such person's nationality ... and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." Thus, to prove they are "refugees," Gloria and Geraldine Grajo must demonstrate either actual past persecution on account of one of the five protected grounds listed in the Act, or that they hold "an objectively reasonable fear of such persecution in the future." Angoucheva v. INS, 106 F.3d 781, 787 (7th Cir.1997); see Marquez v. INS, 105 F.3d 374, 377 (7th Cir.1997). This appeal involves the Grajos' joint asylum application based on alleged past persecution and fear of future persecution based on their political opinions.
 
 
 11
 The BIA found that Gloria failed to demonstrate past persecution, and that neither Gloria nor Geraldine established a well-founded fear of future persecution based on political opinion. We review this factual determination under the substantial evidence test. See, e.g., Tzankov v. INS, 107 F.3d 516, 518 (7th Cir.1997). Hence, this court "will uphold the Board's decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " Id. (quoting INS v. E1ias-Zacarias, 502 U.S. 478, 481 (1992)). We will reverse "only if the evidence presented ... was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." Id.
 
 
 12
 Although "persecution" is not defamed in the statute, it is defined in this circuit to mean the "punishment or infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." Draganova v. INS, 82 F.3d 716, 720 (7th Cir.1996) (citation and internal quotes omitted); see Anton v. INS, 50 F.3d 469, 472 (7th Cir.1995). In Elias-Zacarias, 502 U.S. at 482, the Supreme Court stated that to be eligible for asylum, the applicant must show that the persecution occurred because of his or her own political opinion, and not because of the political opinion of the persecutor. Moreover, the Court required that asylum applicants establish the alleged persecution "on account of' political opinion by direct or circumstantial evidence. See id. at 483. Thus, applicants can no longer establish persecution "on account of' one of the protected grounds by mere inference, "unless the inference is one that is clearly to be drawn from the facts in evidence." Sangha v. INS, 103 F.3d 1482, 1486 (9th Cir.1997). In other words, although applicants need not offer conclusive proof of their assertions, they must "present specific facts that give rise to an inference that he or she has actually been the victim of persecution ... on account of ... political opinion." Marquez, 105 F.3d at 379 (internal quotations omitted); Draganova, 82 F.3d at 720-21.
 
 
 13
 The Grajos attempted to show past persecution and fear of future persecution based on Gloria's membership in the K.B.L.[4] Gloria claimed that she was the object of jealousy and false accusations because her political opponents objected to her appointment as secretary of her Barangay's arbitration board. She also stated that her duties at the university were decreased because of her political affiliations. Not only did Gloria fail to support any of these claims with any evidence beyond her own testimony, she also did not allege any specific facts that would give rise to an inference that the harm she allegedly endured was of such severity or magnitude as to rise to the level of persecution. To the contrary, Gloria was reappointed as Barangay secretary even after Marcos lost power, and despite her colleagues' disapproval, the chairman of the board-always took her side in the disputes. Moreover, nothing in the record shows that ill-treatment from her colleagues prompted her to leave the country. Although the dividing line between persecution and discrimination or harassment may not always be clear, see Bucar v. INS, 109 F.3d 399, 403 (7th Cir.1997), the loss of Gloria's job privileges and rebuffs by her Barangay co-workers clearly fall into the latter category. See id.; See also Krastev v. INS, 101 F.3d 1213, 1217 (7th Cir.1996) ("brief detentions and mild harassment" by themselves do not constitute persecution) (quoting Skalak v. INS, 944 F.2d 364, 365 (7th Cir.1991)); Urulov v. INS, 55 F.3d 222, 228 (7th Cir.1995) (Bulgarian government's restriction of ethnic-Macedonian's employment opportunities "does not rise to the level of 'infliction of harm' ... that we find 'illegitimate' to justify granting asylum").
 
 
 14
 Gloria claimed that her departure from the Phillippines was prompted by her rape by Arsenio Dumlao, a person politically connected to the party ostensibly opposed to Marcos' K.B.L. party to which Gloria belonged, and who had threatened her with violence if she reported his attack. On appeal, Gloria contends that the BIA failed to draw the inference from these allegations that she was singled out and harmed by Mr. Dumlao for her political opinion, and therefore, that she endured past persecution, and because he is still in power, that the Grajos hold a well-founded fear of future persecution. We begin by noting that--unlike in the prior analysis--the determination of whether Gloria's rape allegations support an inference of "persecution" within the meaning of the Act does not hinge on line drawing between levels of harm. As acknowledged by the BIA, rape is a type of harm sufficiently severe to constitute "persecution" if it is on account of one of the protected grounds in the Act. In other words, the resolution of whether Gloria's rape allegations support an inference of past (or a well-founded fear of) political persecution depends on the showing of a sufficient connection or nexus between Gloria's rape and her political opinions. See Elias-Zacarias, 502 U.S. at 483. As noted recently in the Ninth Circuit, the "petitioner must prove something more than violence plus disparity of views." Sangha, 103 F.3d at 1487. Although the Grajos attempted to connect Gloria's rape to her political beliefs by pointing to Mr. Dumlao's political connections to Filipino political leaders such as President Ramos and former President Corazon Aquino, the Grajos do not point to any facts supporting an inference that she was attacked because of her political opinions or viewpoints. For instance, the record does not suggest that Gloria was attacked for refusing to renounce her K.B.L. party-affiliations or for speaking out against or participating in activity condemned by the party currently in power. Furthermore, we do not think this is a case like Angoucheva where the inference of political persecution was supported by the proximity in time between the applicant's official interrogation for her suspected anti-government activities and the applicant's sexual assault. See Angoucheva, 106 F.3d at 791 (remanding BIA's denial of asylum request where applicant was sexually assaulted by a government official during the course of an official interrogation).
 
 
 15
 In essence, the Grajos argued that they demonstrated "persecution" within the meaning of the Act by alleging that Gloria's attacker, because of his political connections, could impose violence with impunity. As the following explanation makes clear, these allegations do not support an inference that Gloria was harmed (or that the Grajos are reasonably fearful of being harmed) because of her political opinions. The Grajos' case would be stronger if they would have demonstrated that because of the unpopularity of Gloria's political opinions, the government turned a. blind eye to Mr. Dumlao's crime, thereby condoning his conduct. See Bucar, 109 F.3d at 403 (noting that a campaign of [unofficial] expulsions would constitute persecution "even if the prgroms or the expulsions were merely condoned rather than orchestrated by the government"). But the Grajos presented no evidence to show that Mr. Dumlao singled her out or that the government refused to redress Gloria's injuries because of her political beliefs. Indeed, on the latter point, the government would not have had any way to redress her injuries because Gloria never reported the crime. She claims that reporting her rape would have been futile, pointing to (1) the uninvestigated murders of her relatives, and to (2) Mr. Dumlao's political connections. But the record contains no evidence that the government refused to investigate the murders of the Grajos' relatives because it considered them to be the functional equivalent of outlaws, see id. (noting that a country's refusal to provide legal rights and protections to those holding unpopular political beliefs may support a claim of persecution), or that the Grajo's relatives were murdered because of unpopular political beliefs such as held by the Grajos,[5] see Najafi v. INS, 104 F.3d 943, 947 (7th Cir.1997) (requiring asylum applicant to show relationship between his own politics and those of his relatives subjected to harsh treatment by Iranian authorities). Moreover, Mr. Dumlao's political connections are of dubious significance, given that Gloria's are similar--having also served the government during the Marcos and Aquino regimes--and given that the threats that Mr. Dumlao conveyed to Gloria after raping her may reasonably be interpreted as having been motivated by his desire to cover up his own misconduct, rather than by any political belief held by Gloria or the Grajo family. See Boykov v. INS, 109 F.3d 413, 417 (7th Cir.1997). The inference of political persecution is further weakened by the fact that Mr. Grajo and his son continue to live in the Phillippines without incident, as well as by the fact that neither Mr. Dumlao nor the Philippine government has expressed an interest in Mrs. Grajo or her daughter since their departure. See Tzankov, 107 F.3d at 520 (alleged fear of future political persecution unreasonable where record indicated that petitioner's mother resides in native country without incident and record does not show that mother fears for her safety); INS v. Mitev, 67 F.3d 1325, 1332 (7th Cir.1995) (upholding BIA's denial of asylum and noting that petitioner's family had not been harassed in his absence, nor had authorities expressed an interest in him since his departure).
 
 
 16
 The Grajos point out that refugees fleeing political persecution are often limited in the evidence they can produce to support their claim. Thus, they argue that they should not be faulted for the lack of evidence linking Gloria's political opinions to her rape. Under these circumstances, they argue that we should "impute" a political connection based on Lazo-Majano v. INS, 813 F.2d 1432, 1435 (9th Cir.1987), a case that the Grajos claim is "almost identical" to theirs. In that case, Lazo-Majano's husband had been a member of a paramilitary group distrusted by El Salvador's government. Months after her husband fled the country, Lazo-Majano was repeatedly raped and abused by a sergeant in the Salvadoran military who believed that Lazo-Majano's husband had intended to overthrow the government by unlawful means, and that she too was a "subversive." See id. at 1435. Although Lazo-Majano was not herself politically active, her attacker threatened to report her as a subversive if she were to inform anyone of his actions. Under those circumstances, the Ninth Circuit rejected an argument that the rape and abuse could not be linked to Lazo-Majano's political opinion. See id. at 1433-35. The court's decision emphasized that an apolitical applicant may, nevertheless, demonstrate political persecution where the record shows that the persecutor believed the applicant to hold contemptible political views.
 
 
 17
 Lazo-Majano is not "almost identical" to the case at hand. We know nothing of Gloria's husband's political opinions, and she, indeed, does not claim to be apolitical. To the contrary, Gloria claims to be a member of an opposition political party. Thus, this is not a case in which we need to attribute political views to one who is without any. This court must, however, find a sufficient nexus between the rape and Gloria's political opinion in order to reverse the BIA. Indeed, granting asylum on a record without such a connection would suggest that any rape victim may be granted asylum as a refugee. As Grajos' counsel admitted at argument, this is not the intent of the Immigration Act. As previously discussed, the record in this case does not demonstrate such a nexus.
 
 
 18
 Finally, we reject the Grajos' argument that a remand is required based on this court's decision in Angoucheva. See Angoucheva, 106 F.3d at 789 (remanding because the IJ (and the BIA which had adopted the U's reasoning) failed to give adequate consideration to the petitioner's allegations concerning her interrogation and subsequent sexual assault). Unlike Angoucheva, the BIA did not "adopt" the U's decision in the present case; rather, it conducted a de novo review of the record. The Grajos argue that this de novo review is irrelevant because the IJ had already "tainted" the record. We disagree. Despite the U's objectionable comments, the record shows that the IJ fully considered Gloria's rape allegations. Furthermore, to show a violation of due process based on the IJ's comments, the Grajos would have to show that the IJ denied them their opportunity to be heard. After reviewing the record, we find that the IJ allowed Gloria to fully explain the details of the rape without being overly abrupt or intimidating so much that she could not voice her claims. Indeed, the Grajos have not pointed to any allegations on appeal that they failed to make below on account of the IJ's insensitivity. Thus, because they have not shown that the U's questioning actually had the potential to affect the outcome of the deportation proceedings, their due process claim fails. See Kuciemba v. INS, 92 F.3d 496 (7th Cir.1996).
 
 
 19
 What we have said should emphatically not be understood to condone the unacceptable comments of the IJ. These were, as the BIA noted, insensitive and, we might add, deplorable.
 
 IV. Conclusion
 
 20
 Because the BIA's decision is supported by substantial evidence, and because the Grajos were not denied due process, we AFFIRM the denial of the Grajo's application for asylum and withholding of deportation.
 
 
 
 [1]
 In response to the Immigration Judge's probing of why she did not report the alleged crime, Gloria testified as follows: "Oh, the police is controlled by [Arsenio's] brother. The criminal investigation office. They have--they have agents going around the place. They can just pick you up; shot you or even turn the charges against you."
 
 
 [2]
 The IJ apparently was reacting to the fact that Gloria did not tell the asylum officer that she had been raped, but rather, waited until her hearing to report this incident. Gloria explained that she did not tell the asylum officer about the rape because she did not want to talk about the details of the rape in front of her daughter. Moreover, she stated that she did not know at that time that she could have asked that her daughter be excused, as apparently she did during the hearing
 
 
 [3]
 Although the grant of asylum is discretionary even if the applicant qualifies as a "refugee," withholding of deportation is mandatory once the applicant shows that his or her "life or freedom would be threatened in [his or her native] country on account of race, religion, nationality, membership in a particular social group, or political opinion." See 8 U.S.C. § 1253(h). Because of this difference, a withholding of deportation applicant bears a heavier burden: the applicant must show a "clear probability" of persecution, meaning that "it is more likely than not that [he or she] would be subject to persecution on one of the specified grounds" Angoucheva, 106 F.3d at 788. Because the Grajos failed to satisfy the requirements for asylum, we conclude that they also failed to satisfy the more stringent "clear probability" standard for withholding of deportation
 
 
 [4]
 Although past persecution and well-founded fear of persecution are alternative means of establishing asylum eligibility, we discuss these grounds together because, in either case, the Grajos must establish that the harm endured or feared is "on account of" their political opinions. See Ehas- Zacarias, 502 U.S. at 483
 
 
 [5]
 Although the record lacks any political explanation for the murders of Gloria's brother-in-law and of her uncle, Gloria suggested that her sister-in-law's murder was connected to a land dispute with members of the NPA. The record does not reasonably suggest any connection between this dispute and political views held by either Gloria or Geraldine