**Kajagi A. MWESIGE, Petitioner,**

v.

**John D. ASHCROFT and Immigration and Naturalization Service, Respondents.**

No. 02–2730.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 2003.

Decided March 11, 2003.

Before BAUER, RIPPLE, and EVANS, Circuit Judges.

## ORDER

Petitioner Kajagi Mwesige seeks review of an adverse decision of the Board of Immigration Appeals (the "BIA" or "Board") denying his request for asylum and withholding of removal. For the reasons set forth in this order, we affirm the decision of the BIA and dismiss the petition.

## I

## BACKGROUND

### A. Facts

Mr. Mwesige is a thirty-three year old native and citizen of Uganda. After he graduated high school, Mr. Mwesige joined what he termed a "cadre" group, part of the National Resistance Movement ("NRM"). A.R. 68. As part of this movement, Mr. Mwesige first received two years of training, which Mr. Mwesige referred to as "Chaka Mchaka." *Id.* When Mr. Mwesige finished this training, he was detailed to the Internal Security Organization ("ISO"),[1] and his job was to recruit youths for the NRM and to "politicize" them, i.e. educate them concerning Uganda's past and potential for change. A.R. 33–34. However, Mr. Mwesige eventually discovered that the information that he was providing to his superiors concerning

---

1. According to the 1997 Country Report, the ISO is "primarily an intelligence-gathering body," A.R. 190; however, Mr. Mwesige described the ISO as both an investigatory and police arm of the NRM.

individuals' interest in, or opposition to, the NRM was being used to identify and punish political opponents.

At some point, Mr. Mwesige started to go on missions with the ISO, backed by the National Resistance Army ("NRA"), to participate in the punishment of those opposed to the NRM. Mr. Mwesige testified that on one of the missions, he was ordered to rape a fifteen-year-old girl. When Mr. Mwesige refused, he was punished. Specifically, he was held for three days at the "Basiima House," a military compound that contained housing for officers, soldiers and civilian servants, as well as a detention facility. A.R. 73. While there, he was deprived of food and beaten. Mr. Mwesige testified that he was detained at the Basiima House a total of four times. *See* A.R. 106. The specific events that precipitated most of these incarcerations are not set forth in the record.

At some point, the ISO realized that Mr. Mwesige would not participate in its enforcement activities, and he was no longer taken on rounds with the ISO. Instead, he was demoted to the position of orderly in the service of a major general in the Ugandan army. According to Mr. Mwesige, while in the service of the major general, he shared his opposition to Uganda's involvement in Rwanda with some of the other orderlies. These views made their way back to the major general who sent Mr. Mwesige back to the Basiima House. After a few days at the Basiima House, Mr. Mwesige was asked to do chores for some of the guards and was permitted to move freely about the camp. Two weeks after his arrival, Mr. Mwesige left the Basiima House undetected.

Mr. Mwesige remained in Uganda in hiding for the next two years. During those two years, he was not detected, detained or abused in any way. He also traveled to Kenya three or four times without incident.

Mr. Mwesige arrived in the United States as a visitor for pleasure on June 30, 1994.[2] He applied for asylum on May 7, 1997.[3]

## B. Administrative Proceedings

### 1.

Mr. Mwesige's asylum application was referred to an IJ for a hearing. Upon reviewing the written materials submitted by the parties, the IJ was concerned that he did not have adequate information about the "cadre" group or Mr. Mwesige's participation therein to make an informed decision on the asylum application. As a result, the IJ asked that Mr. Mwesige give some foundational information concerning the cadre and his experiences in Uganda; the IJ used this background to make a more detailed request for information to the State Department. The IJ requested

> an assessment by your office as to the plausibility of the applicant's claim. With regard to the "cadre" group that the applicant claims caused his flight from Uganda, I can find no reference to this organization in any State Department Reports. Assuming that this organization exists, would punishment for

---

**2.** Mr. Mwesige obtained his visitor's visa under false pretenses. Specifically, Mr. Mwesige had represented that he was a member of a traveling table tennis team that was scheduled to compete in the United States; the representations were made with the knowledge and approval of the team's coach. Mr. Mwesige, however, was not a member of, or affiliated in any way with, the team.

**3.** Mr. Mwesige also requested withholding of removal and relief pursuant to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. On appeal to this court, Mr. Mwesige focuses only on asylum and withholding of removal.

desertion be something that might be plausible under current country conditions? Is it possible that "cadre" members would have direct contact with high military officials about political issues? A.R. 155. The State Department's response was received shortly before the continuation date of the trial. It stated:

We have contacted our Embassy in Kampala, but are unable to provide any information relating specifically to this individual. Furthermore, the Embassy was unsure of what "cadre" paramilitary group the applicant was referring to, and thus could not confirm or deny that such a group existed. It is possible that the applicant was referring to a "Chaka Mchaka" course; courses of political and military indoctrination which are offered to the public, and required of all military personnel. If so, applicant's claims of persecution would derive not from his participation in the Chaka Mchaka course, but from his position with the National Resistance Movement and the Internal Security Organization (ISO). However, as it is unclear to which group the applicant is referring, we are unable to answer specific questions relating to this group.

The applicant claims that he was assigned to the ISO in 1991, and believed that his role would be one of a recruiter and a liaison between civilians and the military. At that time, the ISO had a widespread reputation for brutality and human rights violations, including torture and rape. While we have no information indicating whether or not the applicant was himself a persecutor, it is unlikely that an individual could have joined the ISO without knowing what type of organization it was, or in what activities he might be required to participate.

The applicant claims that he refused to participate in human rights violations as ordered by his superiors, and that, therefore, he was demoted, detained, and tortured. It is highly likely that a member of the ISO who refused to participate in ISO activities would be demoted, detained, and even beaten for their insubordination. It is likely that a military deserter could face similar punishment. While the death sentence can be imposed on military members for treason, it is not clear that refusal to participate in ISO activities or desertion would amount to treason.

A.R. 152–53.

After considering the State Department's response and the remainder of Mr. Mwesige's testimony, the IJ issued his order. He determined that Mr. Mwesige had "failed to establish either past persecution or a well-founded fear of future persecution within the meaning of Section 208 of the Act." A.R. 41. Although the IJ did "not believe th[e] record establishes solely based upon the respondent's membership and/or actions during a 1 or 2 year period that he has committed human rights violations[,]" the IJ stated that "when considering the respondent's voluntary membership in support of the NRM as a civilian, I do not find that the punishment he received because he was viewed as insubordinate, rises to the level of past persecution." *Id.*

Unlike Mr. Mwesige's testimony regarding his first few incarcerations at Basiima House, the IJ stated that "[t]he circumstances and facts surrounding the respondent's last detention, however, do not sound credible or believable to this Court." *Id.* at 42. The IJ did not believe that Mr. Mwesige's views on Rwanda would come to the attention of a high-level government official and, even if they did, he did not believe that the last incarceration at Basiima House, as described by Mr. Mwesige, constituted past persecution. The IJ then noted:

I also find troubling the fact that the respondent was able to assume a new identity in Uganda and traveled back and forth to Kenya on 3 or more occasions without any difficulty. The respondent remained in Uganda for approximately a year and a half and voluntarily returned to Uganda from Kenya without difficulty. Even more troubling, is the fact that the respondent filed for asylum under his assumed name. Why would the respondent not reveal his true identity when making his claim for asylum. As argued by the Government Attorney, this type of action suggests that the respondent may actually be hiding his true identity for other reasons. While this Court cannot draw any conclusions based upon the respondent's use of an assumed name when seeking asylum, it certainly doesn't support the overall credibility of his claim.

*Id.* at 43–44.

### 2.

The BIA summarily affirmed the IJ's decision. It stated: "The Board affirms, without opinion, the results of the decision below. The decision below is, therefore, the final agency determination. *See* 8 C.F.R. § 3.1(a)(7)." A.R. 2.

Mr. Mwesige filed a timely petition for review in this court.

### II

### ANALYSIS

### A. Standard of Review

"When the BIA summarily adopts an IJ's decision, we review the IJ's analysis as if it were the Board's." *Mousa v. INS,* 223 F.3d 425, 428 (7th Cir.2000). In assessing the IJ's decision, this court reviews any pure questions of law, including whether the IJ applied the correct standard for determining persecution, de novo. *See Asani v. INS,* 154 F.3d 719, 722–23 (7th Cir.1998). The IJ's factual determinations, however, are reviewed under the "substantial evidence" test. *Mansour v. INS,* 230 F.3d 902, 905 (7th Cir.2000). Under this standard, the court must affirm the IJ's decision if it is "supported by reasonable, substantial, and probative evidence on the record" and may reverse only when the evidence is "so compelling that no reasonable factfinder" could conclude that the asylum standard had not been met. *Id.*

### B. Proper Legal Standard

Mr. Mwesige faults both the IJ and the BIA for failing to evaluate his claims according to the proper legal standards. We address these points briefly.

Mr. Mwesige first argues that the IJ must have misunderstood the standard for granting asylum and withholding of removal. Although these types of relief have different criteria, Mr. Mwesige explains, the IJ did not address each type of relief individually. However, as this and other courts have recognized "[w]ithholding of removal's clear probability standard is more stringent than asylum's well-founded fear standard, in part because withholding of removal is a mandatory form of relief. Consequently, failure to satisfy the lesser standard of proof required to establish eligibility for asylum necessarily results in a failure to demonstrate eligibility for withholding of deportation." *Li v. Ashcroft,* 312 F.3d 1094, 1099 (9th Cir.2002) (internal quotation marks and citations omitted). Therefore, it was not incumbent on the IJ to undergo a separate analysis for withholding of removal once he had determined that Mr. Mwesige was not eligible for asylum.

Mr. Mwesige also contends that the IJ applied the wrong standard in evaluating his claim for asylum. However, there is simply no indication in the record that

the IJ evaluated Mr. Mwesige's claim based on an incorrect standard; indeed, the IJ recited the following standard in his written opinion:

Under Section 208(a) of the Act, the Attorney General and the Immigration Court as its delegate may grant asylum to an alien who is physically present in the United States, if the alien meets the statutory definition of refugee. A refugee is defined as an individual who is unable or unwilling to return to his or her native country, "because of persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group or political opinion." See Section 101(a)(42)(A) of the Act. In order to establish eligibility for asylum, the respondent carries the burden of establishing either past persecution or a well-founded fear of future persecution. The Immigration statute provides no definition for the phrase "well-founded fear of persecution." However, the courts have indicated that an applicant for asylum can establish a well-founded fear by showing that a reasonable person in his or her circumstances would fear persecution for one of the five specified grounds.

See A.R. 34–35 (internal citations omitted). We find no error in this recitation.

■ Finally, Mr. Mwesige takes the BIA to task for failing to review thoroughly his claim. According to Mr. Mwesige, "[t]he Board d[id] not show that it was actually aware of the facts of Mwesige's claim, nor d[id] the Board give any clue as to whether it [wa]s aware of conditions prevailing in Uganda at the time of its decision, as opposed to the time the IJ made his decision." Petitioner's Br. at 17–18. However, this court has held that "absent evidence to the contrary, we assume that the BIA reviewed the specific findings of the immigration judge in light of the record...." *Man v. INS*, 69 F.3d 835, 838 (7th Cir.1995). Here, Mr. Mwesige does not come forward with any evidence, save his own speculation, that the BIA failed to review his claim. Consequently, we shall not disturb the BIA's decision on this basis.

## C. Current Country Conditions

■ Mr. Mwesige next suggests that this court should reverse the BIA's order because the BIA failed sua sponte to consider the most recent State Department report on Uganda before affirming the IJ's decision. However, this court never has recognized such a responsibility on the part of the BIA, and Mr. Mwesige has not cited any authority—from this or other circuits—imposing such a requirement. *See Meghani v. INS*, 236 F.3d 843, 848 (7th Cir.2001) ("However, we find no cases in which we held that the BIA is required to sua sponte take administrative notice of the most recent country report, and Meghani cites no cases holding such."). Additionally, Mr. Mwesige has not pointed to any material differences between the 1997 report (considered by the IJ) and the 2001 report, nor has he explained how any differences might impact his asylum claim.

## D. Asylum Determination

Finally, Mr. Mwesige maintains, albeit indirectly, that the IJ's asylum determination was not supported by substantial evidence. We examine below the IJ's conclusions that Mr. Mwesige has not suffered past persecution and does not have a well-founded fear of future persecution. As noted above, we review the IJ's asylum determination according to a deferential standard; we may reverse the IJ only if the evidence compels a contrary result.

### 1.

The IJ separated Mr. Mwesige's experiences in the ISO into two separate catego-

ries—his first three incarcerations at Basiima House and his last incarceration at Basiima House—for purposes of considering whether Mr. Mwesige had suffered past persecution. With respect to Mr. Mwesige's first three incarcerations at Basiima House, the IJ did not believe that these experiences rose to the level of persecution because "it d[id] not appear that the respondent was disciplined to any greater extent than any other supporter who may have been viewed as insubordinate." A.R. 42.[4] With respect to his last incarceration at Basiima House, the IJ did not find the events surrounding Mr. Mwesige's incarceration or departure to be "credible or believable." A.R. 42. Specifically, the IJ did not believe that Mr. Mwesige's views on Rwanda would have found their way to the major general. Additionally, even if Mr. Mwesige was sent to Basiima House for his views, the IJ did not believe that Mr. Mwesige's two-week stay at the Basiima House, during which he was free to leave his cell and wander the complex, constituted persecution.

### a.

■ Turning first to Mr. Mwesige's first three incarcerations, these were a result of Mr. Mwesige's refusal to obey orders of his ISO superiors. There is no question that at least some of the actions Mr. Mwesige refused to engage in were inhumane; the record is unclear with respect

to others. Without diminishing the heinousness of the ISO's actions, we nevertheless believe that there is support in the record for the IJ's determination that Mr. Mwesige's experiences did not constitute past persecution.

Initially, it does not seem that the discipline Mr. Mwesige received was more severe than that meted out against other ISO members who were viewed as insubordinate—a factor this court has considered in determining whether an applicant has suffered past persecution. *See, e.g., Urukov v. INS,* 55 F.3d 222, 228 (7th Cir.1995) ("It is true that he was incarcerated for fifteen days during his service, but the punishment was in response to his fighting with fellow soldiers and defiance of military authority. While our sympathies may be aroused by his defense of his family an ethnic heritage, Urokov has presented no evidence to substantiate his claim that his incarceration was anything but an exercise of military discipline."). Mr. Mwesige counters that there was no factual basis from which to conclude that his punishment was more or less severe than that of other ISO affiliates who disobeyed or refused to follow orders. However, the IJ's conclusion finds support both in Mr. Mwesige's testimony and in the State Department's response to the IJ's inquiries. Mr. Mwesige testified that other people who had disobeyed orders were incarcerated at Basiima House.[5] Addition-

---

4. Although the IJ did not make a specific determination concerning Mr. Mwesige's testimony on these events, lack of credibility on Mr. Mwesige's part was not one of the stated reasons that the IJ rejected his application for asylum; instead, the IJ believed that these events did not constitute persecution because the punishment for Mr. Mwesige's insubordination appeared to be no more harsh than punishment for other forms of insubordination.

5. Mr. Mwesige testified as follows:

Q: Was anybody else treated this way? Other people too?
A: Yes, other people.
Q: And after they detained you in a cell or room for a few days, then what did you do, go back to the barracks?
A: Yeah, they would bring you out, because always they are bringing in people and sometimes when they feel crowded, then they bring in some other people, they bring most other people who have disobeyed more than you did, then they would take you out.
A.R. 106.

ally, the State Department confirmed that ISO members who were considered insubordinate were punished; the Department's response to the IJ stated: "It is highly likely that a member of the ISO who refused to participate in ISO activities would be demoted, detained and even beaten for their insubordination." A.R. 153. The State Department did not suggest that the ISO superiors made any distinctions among the types of insubordination or an individual's motives for refusing to carry out an order.

■ We note that there is a line of cases from the Ninth Circuit that recognizes persecution as including punishment for refusing to carry out inhumane orders. In *Tagaga v. INS*, 228 F.3d 1030 (9th Cir.2000), for instance, that court stated:

It is well established, however, that a government may not legitimately punish an official for refusing to carry out an inhumane order. This is a corollary of the universally recognized principle that obedience to superior orders does not relieve an official from responsibility for humanitarian law or human rights violations. Indeed, had Tagaga, following orders, directly participated in the persecution of Indo–Fijians, he would be ineligible for asylum under 8 U.S.C. § 1158(b)(2)(A)(i).

*Id.* at 1034 (internal quotation marks and citations omitted). However, in his brief, Mr. Mwesige did not point us to this or any other authority supporting the proposition that his punishment for refusal to obey the ISO's orders could be considered persecution. Consequently, we believe that any argument based on this authority is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").

However, even if Mr. Mwesige had cited the above (or similar) authority, it is unclear how helpful these cases would be to Mr. Mwesige based on the record before us. Unlike the individuals in the Ninth Circuit cases, Mr. Mwesige was not a member of the military, nor is it clear that his participation in the cadre group or the ISO was compelled. *See Ramos–Vasquez v. INS*, 57 F.3d 857, 865–66 (9th Cir.1995) (noting that petitioner, as well as petitioner in a predecessor case, "was forcibly recruited"). Indeed, the fact that Mr. Mwesige lived in Uganda for two years without incident after his last incarceration weighs heavily against a finding that Mr. Mwesige's continued participation in the ISO was forced and therefore that his punishment for disobeying orders constituted past persecution. *Cf. Meghani*, 236 F.3d at 847 (noting that Meghani's residence in Pakistan for two years after an attack by an opposition group weighed against a finding of past persecution); *Urukov*, 55 F.3d at 229 (noting that Urukov was left alone for nine months after his arrest and that this weighed against a finding of persecution).

**b.**

■ We turn now to Mr. Mwesige's last incarceration in Basiima House. With respect to this incarceration, the IJ had difficulty believing that Mr. Mwesige's views on Rwanda would have found their way to the major general to whom Mr. Mwesige was assigned as an orderly. The IJ also did not believe that Mr. Mwesige's resulting incarceration was persecution based on Mr. Mwesige's relative freedom within the complex and his departure from Basiima House without opposition. We evaluate this conclusion below.

We do not have the same difficulty as the IJ in believing that a major general in the Ugandan army would want his house-

hold staff to share his political views and, indeed, would seek out and punish those who did not. It is, however, the IJ's credibility determination, not ours, that must prevail. Nonetheless, we agree that the remainder of the IJ's analysis is supported by the evidence in the record. Specifically, we do not believe that Mr. Mwesige's incarceration for two weeks, characterized as it was by a certain degree of freedom, constitutes past persecution. Furthermore, this incarceration was followed by two years during which time Mr. Mwesige was not pursued with any urgency by the ISO or the NRA. The fact that Mr. Mwesige lived in Uganda for two years without being uncovered or mistreated by the authorities weighs against a finding of past persecution. *See Meghani*, 236 F.3d at 847; *Urukov*, 55 F.3d at 229. Consequently, we cannot conclude that the evidence of record compels a finding of past persecution and, therefore, we cannot reverse the IJ's decision on this basis.

### 2.

Mr. Mwesige also takes issue with the IJ's conclusion that he does not have a well-founded fear of future persecution. In reaching this conclusion, the IJ relied upon the fact that Mr. Mwesige had left the ISO without incident, that he had lived in Uganda for two years without being detected, that he had traveled at least three times to Kenya, that his family still lived in Uganda and that they had not been harmed in any way. The IJ also noted "that the human rights situation [in Uganda] has improved in more recent times" and that opposition leaders were returning to that country. A.R. 43. The IJ's conclusion, therefore, is supported by reasonable and probative evidence of record. Given this deferential standard of review, we cannot disturb the IJ's asylum determination.

### Conclusion

For the foregoing reasons, the petition for review is denied, and the judgment of the BIA is affirmed.

PETITION FOR REVIEW DENIED; AFFIRMED